FIRST DIVISION

December 5, 2005

No. 1-04-1873

CARLA BOURGONJE, ) Appeal from the

) Circuit Court of

Plaintiff-Appellant, ) Cook County.

)

v. ) No. 01 L 13683    )

LUANN MACHEV, ) Honorable

) Michael Hogan, 

 Defendant-Appellee. ) Judge Presiding.

JUSTICE GORDON delivered the opinion of the court:

Plaintiff, Carla Bourgonje, appeals from the grant of summary judgment to her landlord, defendant, Luann Machev, in her claim for damages resulting from the criminal attack of a third party.  For the following reasons, we affirm in part, reverse in part, and remand.

I.  FACTUAL BACKGROUND

On October 29, 2001, Bourgonje filed a two-count complaint against Machev seeking to hold her responsible for an attack that began as a robbery on the sidewalk outside the front gate of her apartment building, but concluded as a  rape after the perpetrator forced her to the back of the apartment building.  In the first count, Bourgonje alleged that Machev had assumed a duty to protect her against such attacks in that she

"undertook to provide the Plaintiff with a security lights [
sic
] to reduce the risk of criminal conduct at the property.  The lights provided by Machev were security lights installed for the specific purpose of making the property safe and visible at night and to discourage criminals and not for identification of address signs or for aesthetic reasons."

The complaint further alleged that Bourgonje "relied upon the security lights provided by the Defendant in leasing the property, in using the property and for the purpose of safely entering and existing [
sic
] the property at night."  She complained, however, that Machev failed to repair the exterior lights or otherwise maintain them, or to warn her that the lights were not repaired.  She alleged that as a result of the lack of lighting she was subjected to the sexual assault.  The second count alleged that Machev had assumed and breached a duty of providing security for Bourgonje through installing, but not maintaining, door buzzers, which also proximately caused her injuries.  

Following the close of discovery, Machev moved for summary judgment.  In her motion, she argued that she owed no duty to Bourgonje because the landlord-tenant relationship was not recognized as a "special relationship" imposing a duty to protect against third-party criminal attacks; the lights and door buzzers were not a voluntary undertaking to provide security, but were rather intended merely as conveniences; and because the attack was an independent, unforeseeable, superceding cause removing any causation of injury from any alleged acts or omissions of Machev.

The circuit court granted the motion, ruling:

"Plaintiff alleges that the defendant assumed the duty to provide security by providing the bells and the lights. * * * [H]aving doorbells on the outside of the gate is not an assumption of a duty.  In addition, there is no evidence that the bells were defective.  And that's a question of right.

* * * 

Here the court finds that the placement of lights outside the building was not an assumption of duty to provide security.  Almost all buildings provide *** outside lighting. ***

Next, the Court finds that ***  if there was negligence [on the] part of the defendant it was not the proximate cause of the injury.  It's simply too speculative.  The attack would have happened regardless of defendant's negligence, and the defendant [presumably 'plaintiff' was intended] would have been forced by the third party to enter the gate regardless of the lights. ***  It is simply too speculative ***  that if the lights would have been working, the third party would have stopped the attack, would have fled, or simply continued and gone to the south side of the building."

The circuit court also appeared to find it significant that the attack began outside of the actual grounds of the mansion, though it did not elaborate on the reasons why that fact was significant in its analysis.

In reaching its determination, the court had before it the depostions of Bourgonje and Machev; Charles Troche, the apartment building's handyman; Gabe Fajuri and Barry Bursak, other tenants of the building; Larry Ligas, a real estate developer in the Logan Square area and co-founder of Logan Square Concerned Citizens; plus Detectives Hart and Thaxton, who investigated the attack on Bourgonje.  The parties likewise presented the court with a copy of the lease between Bourgonje and Machev, as well as their respective answers to the other's interrogatories.  Finally, the court possessed the signed confession of Juan Delgado, who pled guilty to raping Bourgonje.  From this evidence, the following facts appear to be undisputed.   

Bourgonje, a cultural affairs officer for the Chicago office of the Ministry of Foreign Affairs of the Netherlands, responded to an advertisement for an apartment placed in the Chicago Tribune  in August 2001.  The advertisement stated:  "Logan Square historic mansion on Boulevard.  1,700 square feet, two bedroom, two bath.  Whirlpool, ornate woodwork and glass.  Large balcony.  Two blocks to the L. $1,600 HTD."  She called a telephone number provided in the advertisement and spoke with the landlord, Machev.  The two arranged to meet at the mansion, which was located at 2410 North Kedzie Avenue, in Chicago, on the following Saturday.

The mansion had single, large apartments on each of its three floors.  There was a front door, facing east onto Kedzie, which allowed access to the second-floor apartment.  There was also access to the apartments through a side door on the north side of the building.  To access the grounds of the mansion, one had to pass through a locked gate.  A path ran from the front gate alongside the north side of the mansion, passing through another gate just west of the northeast corner of the building.  Adjacent and attached to the mansion was a theater at 2408 North Kedzie, formerly used by the fraternal order of the Knights Templar.  The theater could be accessed through a door in a sunken alcove beyond the side door. 

A panel for an intercom system was next to the gate.  The intercom system was meant to allow visitors to notify the residents of their presence by sounding a buzzer inside their apartments, but the residents could not remotely unlock the gate using the intercom system.  The buzzer/intercom system was unreliable, however, and regularly in need of repair.  The apartments' mailboxes were also outside the front gate.  

In front of the building, parallel with and south of the front porch were two antique streetlights, holding three lamps each.  There was an additional antique street lamp outside the gate.  A set of two floodlights was on the north side of the balcony, which was over the front porch.  There were two more sets of two floodlights attached to a turret farther west on the north side of the building.  At least one of these sets was fitted with a motion detector.  Another set of floodlights was placed farther west yet on the north side of the building, but short of the side door.  Each of these sets of floodlights was attached between the second and third floors of the mansion.  Another single floodlight was placed in the ground pointing up onto the south side of the building.  Finally, there was a light in a cone-shaped fixture immediately in front of and above the side door.  

Bourgonje signed a lease and paid a security deposit for her apartment shortly after her initial visit to the mansion.  The lease included the following provisions:

"6.  LESSOR TO MAINTAIN

A.  Tenant hereby declares that Tenant has inspected the Apartment, the Building and all related areas and grounds and that Tenant is satisfied with the physical condition thereof.  Tenant agrees that no representations, warranties (express or implied) or covenants with respect to the condition, maintenance or improvements of the Apartment, Building, or other areas have been made to Tenant except (1) those contained in this Lease, the application or otherwise in writing signed by Lessor and (2) those provided under applicable law.

* * * 

21.  RESIDENT TO INSURE POSSESSIONS/LIMITATIONS OF LANDLORD LIABILITY:  Lessor is not an insurer of Tenant's person or possessions.  Tenant agrees that all of Tenant's person and property in the Apartment or elsewhere in the Building shall be at the risk of Tenant only and that Tenant will carry such insurance as Tenant deems necessary therefor.  Tenant further agrees that, except as provided under applicable law and except for instances of negligence or willful misconduct of Lessor, its agents or employees, Lessor, its agents and employees shall not be liable for any damage to the person or property of Tenant or any other person occupying or visiting the Apartment or Building, sustained due to the Apartment or Building or any part thereof or any appurtenances thereof becoming out of repair (as example and not by way of limitation), due to damage caused by water, snow, ice, frost, steam, fire, sewerage, sewer gas or odors; heating, cooling, and ventilating equipment, bursting leaking pipes, faucets and plumbing fixtures; mechanical breakdown or failure; electrical failure; the misuse of or non-operation of observation cameras or devices (if any), master or central television equipment and antennas (if any), cable television equipment (if any) or mailboxes; or due to the happening of any accident in or about the Building; or due to any act or neglect of any other tenant or occupant of the building or any other person.  Further, except as provided by applicable law, Lessor shall not be liable to Tenant for any damage to the person or property of Tenant sustained due to, arising out of, or caused by the acts or omissions of any third party whether or not such third party is a tenant of the Building."

Around 11:10 on the evening of October 2, 2001, Bourgonje returned home after having a dinner and attending a performance at the Lyric Opera with a friend.  She found a place to park her car approximately one block away from the mansion.  When she gathered her mail from her mailbox, a man pushed her into the mansion's gate and placed his hand over her mouth and nose.  The attacker told her that he would not hurt her, that he only wanted her "gold and cash."  As she struggled against her attacker, Bourgonje pressed some of the intercom/buzzer buttons with either her elbow or her hand.  The attacker then told Bourgonje to open the gate, and she complied.  The attacker, while continuing to choke her, pushed her down the path leading to the front door and then along the north side of the mansion.  During this time he told Bourgonje that she would perform various sex acts with him.  The attacker continued to push her along until he had her in the alcove beyond the side door.  Once in the alcove, the attacker followed through on his threat and raped Bourgonje.

After the attack, Machev called an electrician to the mansion.  The electrician performed work on the exterior lights at a cost of $654.

Aside from these undsiputed facts, however, the testimony diverged widely.  To begin, the parties dispute what conversations occurred and what promises were made surrounding the exterior lighting at the mansion prior to Bourgonje signing the lease.

According to Bourgonje, she inquired extensively about security at her first meeting with Machev.  Bourgonje testified in her deposition that she and Machev had the following conversation about security at the mansion:

"[Machev spoke] about how well-lit the place is, because I told her I'm a single person and my job takes me out almost every other night.  *** So I did ask her about that, how well-lit everything was, because I come home many times quite late.  And she said it was absolutely well-lit and taken care of, because she is also a single woman and she knows how important it is to live somewhere and feel safe.

* * * 

The house is very far away from–you have to go through a gate.  Then you have to have a long walkway and there's the house, and you have steps and then you go into the building.  So you should lit [
sic
] it up.  She said, 'Oh yeah.  Absolutely no problem.' " 

Bourgonje also testified that Machev had promised that repairs would be made to the buzzers which only worked irregularly.

Machev, on the other hand, in her deposition, testified that she only remembered two subjects of conversation with Bourgonje when she first showed her the apartment, neither of which dealt with security.  In one conversation they "talk[ed] about the history of the building *** talk[ed] about the history of the halls. *** [W]e had some discussion *** about doing it [the apartment] in colors that she wanted."  The other conversation occurred after Bourgonje twisted her ankle and, apparently, broke her sunglasses when coming back into the apartment after seeing the balcony.  According to Machev, Bourgonje repeatedly threatened to sue her "for her sunglasses," which apparently broke during the stumble from the balcony.  Machev specifically denied ever telling Bourgonje that the mansion would be well lit.

Moreover, the testimony varied significantly as to whether the lights functioned regularly, if at all, after Bourgonje became a tenant and what degree of illumination the exterior lights would provide when fully functional.

Bourgonje testified that, on September 10, while moving her possessions into the apartment with the help of friends, she noticed that none of the exterior lights were working and she tripped on the stairs in the dark.  She and her friends saw motion detectors, but they did not activate the lights; they also saw fixtures without lightbulbs.  Bourgonje testified that she spoke with Machev on the twelfth and told her "LuAnn, the lights.  You know, we were there with five people.  There were no lights on.   Nothing went on.  Nothing is on a timer."  Machev responded that she would speak with the mansion's handyman.  Bourgonje thought that she also called the handyman herself.  Bourgonje further testified that between approximately September 14 and September 20, she called and "told [Machev] over and over that it [was] too dark" and that she had "to work on the lights" because there was "no light going on."  However, Bourgonje also noted that one of the ground lights "would go on at very strange hours of the night."  Finally, Bourgonje wrote Machev a memo on September 30,  which she delivered to the doorman of Machev's residence, which stated, in pertinent part:   "The lights outside the house need to be set on a timer so that they go on every day at a certain time, and not late at night.  It's very dark and I fell on the stairs once, don't want to do this again.  Also for visitors, it's just too dark." 

Machev testified that, to her knowledge, all the exterior lights functioned properly with the exception of the lights in the ground, with which she was not concerned.  When she visited the mansion at night in December, following the attack, she observed the lights working.  

According to Troche, Machev told him "Carla was concerned about insufficient lighting outside and that if I could look at the lights, which I've changed floodlights, light bulbs, that is, on the outside of the building, but never seemed to work."  Troche also informed Machev, "[j]ust right after [Bourgonje] moved in," that some of the lights would still not go on after their bulbs were changed, and Machev said she would hire an electrician to come and fix the lights.  Troche also told Machev that he could not find the timers.  Troche further testified that Bourgonje spoke with him about two weeks prior to the attack and told him that she was concerned with the exterior lights since it was "dark for her" and that he then forwarded these concerns to Machev "[w]ithin a day or two," since he could not repair the lights because he "couldn't figure out where the wires ran, if there was a switch or if they were on timers" and that Machev said she would call an electrician.  Later in his deposition, Troche testified that Bourgonje spoke with him about the lights two weeks after she moved in, or around September 27, 2001.  

Troche further testified that the antique streetlight outside the gate was set on a timer from 5 to 11 p.m.; he did not know why those hours were selected and had never set the timer himself.  The two antique streetlights inside the gate were on a switch and, while functional, were not regularly turned on.  Of the remaining exterior floodlights, only one light on a motion sensor worked, activating as one reached the side gate, and would remain illuminated for three to four minutes.   The motion sensor always worked during the five times he visited the mansion at night.  He disputed a police report that attributed a statement to him to the effect that the motion detector was unreliable.  Finally, Troche testified that the light in the cone-shaped fixture also functioned when a tenant would activate its switch, which was located inside the side door.  

Troche testified that the antique streetlight outside the gate, when functioning, would illuminate the walkway up to the front door of the mansion.  The light on the motion sensor would illuminate the north side of the building all the way to the side door, but would not light the sunken alcove. 

Bursak testified that all of the lights on timers functioned properly.  Although he did not know what hours the lights were set for, "[w]hen it was dark, there was light."  Likewise, in his experience, the light on the motion detector always went on as he passed by, though only for about 30 seconds.  He also testified that the lights in the ground functioned properly, illuminating the face of the building, but not the yard.  Bursak remembered the cone-shaped light by the side door being functional on the date of the attack since he had recently changed the lightbulb in it himself and it was usually left on overnight.  However, he had no recollection as to whether or not he had turned on the switch to activate it that night.  Bursak testified that the mansion's exterior lighting was sufficient to allow him to get to the entrance of his apartment and "to be able to know if anybody was around there."

Fajuri, in his deposition, explained that the antique streetlight outside the gate was on 50% to 60 % of the time.  The antique streetlamps inside the gate were on only 40% to 50% of the time.  To his recollection, the motion detector on the exterior floodlights was installed after the attack.  He had no recollection of regularly turning the cone shaped light on or off, "[i]t just sort of happened."  Fajuri otherwise testified that "[o]n occasion the light on the exterior of the house would be on and sometimes, you know, the side light would be on, but it wasn't all or nothing.  It was sometimes yes, sometimes no."  He did not recall the exterior lights going on and off at regular times so as to suggest the operation of a timer.  Likewise, he never remembered tripping a motion sensor and having a light go on.  However, he felt the exterior lighting was adequate to allow him to navigate from the front of the building to the side door to access his apartment.  

Detective Hart was called to the mansion subsequent to the attack.  He recalled there being "no lighting at all" as he walked from the front gate to the sunken alcove, and he had to use a flashlight to locate Bourgonje's personal effects.  However, as he returned to the front of the mansion, a floodlight went off and temporarily blinded him, although he could not say how long it remained on. 

Detective Thaxton and another detective also visited the mansion either on the evening of the attack or the night following.  At that time, none of the exterior lights on the north side of the buildings functioned and they too had to use their flashlights. 

Likewise, Bourgonje's and Machev's testimony diverged as to the operation of the lights at the time of the attack on Bourgonje.  In her deposition, Bourgonje testified there were no lights on at the mansion as she approached and she thought "Damn, that's dark."  She further testified that no lights came on at any point during the attack.  Machev, on the other hand,  testified to overhearing Bourgonje tell the police that as she and her attacker "went around the corner, the light did come on and he was startled, but it wasn't long enough."   

II.  ANALYSIS

On appeal, Bourgonje contends that the circuit court erred in granting summary judgment because it failed to consider the effect of Machev's promises to her in evaluating whether Machev voluntarily undertook to provide security and therefore owed her a duty.  She further contends that whether the nonfunctioning door buzzers and lights were a cause of the attack was a question of fact that should have been left to the jury.  Machev, on the other hand, contends that there was no voluntary undertaking assumed under the lease and that there could be no proximate cause as a matter of law, even if she had assumed a duty to Bourgonje. 

A.  Summary Judgment Standards

Summary judgment should be granted when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and the moving "party is entitled to a judgment as a matter of law."  735 ILCS 5/2-1005(c) (West 2002).  However, summary judgment is a drastic measure and should only be granted when the moving party's right to judgment is clear and free from doubt.  
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90, 102
 (1992).  Thus, all evidence before a court considering a summary judgment motion must be considered in the light most favorable to the nonmoving party (
In re Estate of Hoover
, 155 Ill. 2d 402, 410-11 
(1993)), and 
summary judgment should be denied not only if there are disputed facts, but also if reasonable people could draw different inferences from the undisputed facts (
Wood v. National Liability & Fire Insurance Co.
, 324 Ill. App. 3d 583, 585 
(2001)).

The movant bears the initial burden of production in a motion for summary judgment.  
Williams v. Covenant Medical Center
, 316 Ill. App. 3d 682, 689
 (2000).  A defendant moving for summary judgment may meet its burden of production either by presenting evidence that, left unrebutted, would entitle it to judgment as a matter of law or by demonstrating that the plaintiff will be unable to prove an element of its cause of action.  
Williams
, 316 Ill. App. 3d at 688
.  Until the defendant supplies facts that would demonstrate its entitlement to judgment as a matter of law, the plaintiff may rely on the pleadings to create questions of material fact.   
Williams
, 316 Ill. App. 3d at 689
.  However, should a defendant present such facts, the burden then shifts to the plaintiff to present some evidence allowing the imposition of liability on the defendant and supporting each element of his cause of action, thereby defining a material issue of fact to be determined at trial.  
Williams
, 316 Ill. App. 3d at 689
; 
Wortel v. Somerset Industries, Inc.
, 331 Ill. App. 3d 895, 899-900
 (2002); 
Garcia v. Nelson
, 326 Ill. App. 3d 33, 38
 (2001). 

"Like other issues of duty, whether a defendant has voluntarily undertaken a duty to a plaintiff is a question of law for the court ***."  
Lange v. Fisher Real Estate Development Corp.
, 358 Ill. App. 3d 962, 973 (2005).  
Therefore, 
"[
w]ithout a showing 
from which the court could 
infer
 the existence of a 
duty
, no recovery by a plaintiff is possible as a matter of law and 
summary judgment
 in favor of the defendant is proper."  
Haupt v. Sharkey
, 
358 Ill. App. 3d 212, 216 (2005)
.  
However, though a question of law, if there is a dispute of material fact affecting the existence of an undertaking of a duty, summary judgment is improper.  See 
Protective Insurance Co. v. Coleman
, 144 Ill. App. 3d 682, 686, 688 (1986) (after noting that "
[s]ince the construction of an insurance policy is a matter of law, summary judgment would appear to be an appropriate disposition when such construction is at issue," holding that "
[h]ere, the aforementioned factual issues were material to a determination of plaintiff's duty to defend its insured and, therefore, demonstrate that defendant's right to summary judgment was not free from doubt," and that "the trial court erred in granting summary judgment, as genuine issues of material fact existed").
  Additionally,  
"
[a]lthough the issue of proximate cause is ordinarily a question of fact determined by the trier of fact, it is well settled that it may be determined as a matter of law by the court where the facts as alleged show that the
 
plaintiff would never be entitled to recover."
  
Abrams v. City of Chicago
, 211 Ill. 2d 251, 257-58 (2004).
 

B.  Voluntary Undertaking Claim

The parties do not dispute that the landlord-tenant relationship is not a "special relationship" imposing a general duty on a landlord to protect her tenants against third-party criminal acts (see 
Rowe v. State Bank of Lombard
, 125 Ill. 2d 
203, 215
-16 (1988)), and that a landlord is otherwise not an insurer of her tenants' safety (
Trice v. Chicago Housing Authority
, 14 Ill. App. 3d 97, 100 (1973)).  Likewise, the parties do not dispute that the voluntary undertaking doctrine forms an exception to this general rule.  
As the court in 
Rowe
 explained, a "landlord may be held liable for the criminal acts of third parties when it 'voluntarily undertakes to provide security measures, but performs the undertaking negligently, if the negligence is the proximate cause of injury to the plaintiff.' [Citations.]"  
Rowe
, 125 Ill. 2d 
at 217
.  This exception is derived from sections 323 and 324A of the Second Restatement of Torts (Restatement (Second) of Torts §§ 323, 324A (1965)
), both of which have been adopted by our supreme court.  See 
Rowe
, 125 Ill. 2d 
at 217
; 
Frye v. Medicare-Glaser Corp.
, 153 Ill. 2d 26, 32 (1992).
  The exception may apply whether there is the failure by omission to perform the voluntary undertaking, namely "nonfeasance,"
 as would be the case under these alleged facts, or the negligent performance of the undertaking, namely "misfeasance."  Compare 
Rowe
, 
125 Ill. 2d 
203
, and 
Frye
, 153 Ill. 2d 26 (involving allegations of misfeasance), with 
N.W. v. Amalgamated Trust & Savings Bank
, 196 Ill. App. 3d 1066, 1073 (1990), and 
Chisolm v. Stephens
, 47 Ill. App. 3d 999 (1977) (involving allegations of nonfeasance). 
 
  
   

Section 323, which is the more applicable of the two sections, since it addresses when the injured party is the person for whom the voluntary undertaking was made, as opposed to an injured third party, states:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if 

(a) his failure to exercise such care increases the risk of such harm, or 

(b) the harm is suffered because of the other's reliance upon the undertaking."  Restatement (Second) of Torts § 323, at 135 (1965).

1.  
Could a Duty Have Been Assumed and Breached Through Giving and Reneging on an Oral Promise?

Broken promises to undertake certain performances, namely "nonfeasance," as well as carelessly performed undertakings, namely "misfeasance," are encompassed within section 323.  See
 Restatement (Second) of Torts §
 323, Comment 
a
, at 136 ("It applies whether the harm to the other or his things results from the defendant's negligent conduct in the manner of his performance of the undertaking, or from his failure to exercise reasonable care to complete it or to protect the other when he discontinues it"); Restatement (Second) of Torts §
 323, Comment on Caveat 
d
, at 139 ("There is no essential reason why the breach of a promise which has induced reliance and so caused harm should not be actionable in tort.  This is true particularly where the harm is physical harm, to the person, land, or chattels of the plaintiff.  The technicalities to which the courts have resorted in finding some commencement of performance indicate a development of the law toward such liability"); 
N.W. v. Amalgamated Trust & Savings Bank
, 196 Ill. App. 3d 1066, 1073 (1990) (noting this section incorporated section 325 of the First Restatement (Restatement of Torts § 325 (1935)) under which a plaintiff could recover if he showed "(1) a promise by the defendant to do an act or to render a service; (2) reliance upon the defendant's promise; and (3) injury which was the proximate result of the defendant's omission to perform the voluntary undertaking")
.  Bourgonje argues for recovery on this basis as she contends that Machev "did nothing" with regard to repairing the exterior lighting and that she failed to keep her word to Bourgonje.
(footnote: 1) 

Under Illinois law, 
a plaintiff's reliance on the defendant's promise is an independent, essential element in cases of nonfeasance.  
See 
Vesey v. Chicago Housing Authority
, 145 Ill. 2d 404, 419 (1991) (in the context of section 324A); 
N.W.
, 196 Ill. App. 3d at 1073; 
Chisolm v. Stephens
, 47 Ill. App. 3d 999, 1007 (1977) ("Plaintiff correctly argues that liability for nonfeasance in connection with a gratuitous undertaking may arise where the beneficiaries had relied on its performance. [Citations.]  Under those circumstances the element of reliance lies at the very heart of the cause of action, and is a basic and necessary prerequisite to liability"); 
Stephen v. Swiatkowski
, 263 Ill. App. 3d 694, 704 (1994) (holding a plaintiff can only recover for nonfeasance if he "can show that he reasonably relied on the defendant for protection"
).  With misfeasance, on the other hand, a plaintiff may recover either if he relied on the volunteer's performance, or if the volunteer's performance actually increased the risk of harm to the plaintiff.  See Restatement (Second) of Torts §
§ 323(a), (b) (1965); 
Cross v. Wells Fargo Alarm Services
, 82 Ill. 2d 313, 317 (1980) (holding that a complaint stated a cause of action against the Chicago Housing Authority when it alleged that the Authority contracted for guard services at a housing project only between 9 a.m. and 1 a.m., leading to an upsurge in crime after the guards' dismissal).  In cases of nonfeasance, reliance forms one component of proximate cause.  See 
Mann v. Producer's Chemical Co.
, 356 Ill. App. 3d 967, 973 (2005) 
("Under a voluntary undertaking theory, to establish proximate cause of the injury, the cause-in-fact component, requires a showing that plaintiff relied on the defendant's conduct.  ***  [W]ithout [reliance], there is no reasonable certainty that the 'defendant's acts caused the injury or damage.' [Citation.]").
 
 

We acknowledge that some recent cases, in attempting to draw the distinction between claims of misfeasance and nonfeasance, have stated that " '[w]here a duty of care is imposed by reason of a voluntary undertaking, breach of that duty can be found only where there is misfeasance rather than nonfeasance.' *** [Citation.]"  
Lange
, 358 Ill. App. 3d at 974; 
Jakubowski v. Alden-Bennett Construction Co.
, 327 Ill. App. 3d 627, 639 (2002).  These cases derive that statement from 
Demos v. Ferris-Shell Oil Co.
, 317 Ill. App. 3d 41, 51 (2000), which claimed to derive the principle from 
Chisolm
 without quoting that case or pinpointing to where it found such a holding therein
.  As we have demonstrated above, 
Chisolm
, in fact, does affirmatively state that a plaintiff may recover in the event of nonfeasance if there is reliance.  Moreover, the portion of the statement addressing nonfeasance in 
Demos
 was 
dicta
 since that court held that the defendant had assumed a duty through its actions and then analyzed whether those actions were negligent.  
Demos
, 317 Ill. App. 3d at 51.  Finally, we note that, in evaluating the facts before them, 
Lange
 and 
Jakubowski
, rather than simply applying the blanket rule suggested by 
Demos
, actually, at least in part, based their judgments on the lack of any reliance by their plaintiffs.  
Lange
, 358 Ill. App. 3d at 979 ("Plaintiff is also unable to show that he relied on any undertaking on the part of defendants"); 
Jakubowski
, 327 Ill. App. 3d at 641 ("Plaintiff has not shown how any failure to perform any contractual undertaking increased the risk of harm to [plaintiff] *** or that [plaintiff] relied on such a contractual undertaking").  Thus, we do not see these cases as superceding, or even as attempting to supercede the established rule, set out in 
Chisolm
, that recovery may be had for nonfeasance in gratuitous undertakings when the plaintiff reasonably relies on the defendant's promise.   
 
 

Machev would contend that we may not find any voluntary undertaking based on nonfeasance because, under the merger clause in paragraph 6A of the lease, any promises that could be attributed to her had to be included in the lease.  She further cites to the exculpatory provision in paragraph 21, which purports to deny responsibility for the acts of third parties, as evidence that any promise of security was contractually disclaimed.  However, we note that courts have, in fact, held that tort duties may arise from gratuitous voluntary undertakings irrespective of contractual obligations.  See 
Nelson v. Union Wire Rope Corp.
, 31 Ill. 2d 69, 76 (1964) (holding where an insurer voluntarily undertook to inspect an insured's boilers, " 'the duty arises, with or without contract obligation to inspect, to exercise reasonable care and skill in each inspection so made' [Citation.]"); 
Jakubowski
, 327 Ill. App. 3d at 639 ("In Illinois, a party to a contract may be liable in tort to a third party who otherwise has no enforceable right under the contract under a voluntary undertaking theory of liability"); 
Green v. Long
, 152 Miss. 117, 119, 118 So. 705, 706 (1928) ("It is well settled, however, that, although the lease does not bind lessor to make repairs, yet if he voluntarily undertakes to make them during the term of the lease, he is liable for the want of due care in the execution of the work.  This is based upon the principle of liability for negligence, and not because of any implied covenant to repair or implied consideration").  Nor can Machev meritoriously contend where there is a contract, or, as in this case, a lease, that the rule which permits independent tort recovery is restricted to acts of misfeasance so that no recovery is available to Bourgonje whose cause of action is by her own assertion based on nonfeasance.  

Admittedly, the law has historically drawn a distinction in finding tort duties independent of contractual relations between cases involving misfeasance and nonfeasance.  As Professor Keeton explained:

"The line of division which developed quite early was that between 'nonfeasance,' which meant not doing the thing at all, and 'misfeasance,' which meant doing it improperly.  Much scorn has been poured on the distinction, but it does draw a valid line between the complete non-performance of a promise, which in the ordinary case is a breach of contract only, and a defective performance, which may also be a matter of tort.  In general, the courts have adhered to the line thus drawn; and a failure even to begin or attempt performance of an agreement to lend money [footnote citation to 
Farabee-Treadwell Co. v. Union & Planters Bank & Trust Co.
, 135 Tenn. 208, 186 S.W. 92 (1916); 
John Deere Co. of St. Louis v. Short
, 378 S.W.2d 496 (Mo. 1964)], to employ the plaintiff, to furnish transportation, to deliver goods ordered [
Dawson Cotton Oil Co. v. Kenan, McKay & Speir
, 21 Ga. App. 688, 94 S.E. 1037 (1918); 
Mulvey v. Staab
, 4 N.M. 172, 12 P. 699 (1887); 
Ketcham v. Miller
, 104 Ohio St. 372, 136 N.E. 145 (1922)], to furnish light for a room [
Stone v. Johnson
, 89 N.H. 329, 197 A. 713 (1938)], to obtain the dissolution of an injunction and permit the plaintiff to proceed with the construction of a road [
Chase v. Clinton County
, 241 Mich. 478, 217 N.W. 565 (1928)], or to attend as a physician [
Randolph's Administrator v. Snyder
, 139 Ky. 159, 129 S.W. 562 (1910)], all are held to amount to mere breaches of contract, for which no tort action will lie."  W. Keeton, Prosser & Keeton on Torts § 92, at 659-60 (5th ed. 1984) (hereinafter Prosser & Keeton on Torts).

However, commentators have also noted that there are sound reasons to depart from this historical practice.  

One reason to depart is that the nature of damages resulting from nonfeasance, when the plaintiff relies on a promise, may go beyond the benefit of the bargain:

"When one makes a promise–a commitment as to what he will do or will not do in the future–this generally induces reasonable reliance thereon, and reliance damage apart from benefit of the bargain damage is likely to result.  Some courts are likely to hold that there is a duty to exercise reasonable care, even if the promise is not enforceable as such under contract law, to prevent foreseeable harm to the promisee (as well as to third parties) from reasonable reliance on the promisor to carry out the promise as made.  This is not a duty to perform but rather a duty to prevent reliance damage.  Since the loss suffered is the result of reliance on a manifested intention, it might be preferable to regard the recovery when justified as a type of contractual recovery, especially when the claim is by a promisee and not by a third party.  But contractual liability can be regarded as limited to the type of case where promises are found to be enforceable, and the damage results from the breach of an enforceable promise."  Prosser & Keeton on Torts § 92, at 658.

A second reason to depart can be found in considering the different underlying purposes and protections of tort and contract law both as to plaintiffs and defendants.  As Professor Dobbs explains:

"1. Tort law aims, policies, and rules are well-adapted to deal with physical harms to persons and property and hence with undertakings to provide physical safety.  Although contracts can be made on almost any subject, including safety, most contracts deal with economic relationships.  The policies, rules, and damages measures of contract law are focused accordingly.

2. Tort law duties based upon a safety undertaking are not necessarily as broad as contract duties.  Contract obligations are prima facie strict; the plaintiff need not prove that the defendant negligently breached the contract, only that he breached it. ***  Tort obligations are rarely strict.  Courts can limit the defendant's obligation to perform a gratuitous undertaking to a duty of reasonable care, no more; and in fact the Restatement [section 323] does so.

3. Liability may be limited in tort law where courts think it appropriate.  While a contract obligation might impose liability for any kind of harm, including pure economic harm, courts can limit the obligation imposed by tort law, even when that obligation is rooted in a promise or undertaking.  In fact, the Restatement itself limits the obligation based upon undertakings to physical harms such as personal injuries or property damage.  It thereby excludes the largest number of contract cases, those based upon expectancy of pure economic harms without physical injury." 2 D. Dobbs, Torts § 320, at 867-68 (2001).

As an example of the practical application of these principles, Professor Dobbs puts forth the following example:

"[S]uppose that the defendant, who is standing on the highway's edge, promises to signal if traffic approaches as the plaintiff backs his trailer out of a blind driveway.  The defendant does not watch and does not signal, and the plaintiff is injured backing into oncoming traffic.  Although the promise is gratuitous, the plaintiff's reliance was nevertheless reasonable, and there seems no reason not to enforce the promise as a duty in tort, whether or not it is enforceable in contract.  The promise is one about safety of persons and property, not about an economic exchange.  The moral understanding and expectation of the community would require its performance and reasonable people would perform it.  Finally, nonperformance is unreasonable and negligent; the defendant is held, not merely for breach as in contract cases, but only for negligent breach that created danger and injury."   2 D. Dobbs, Torts § 320, at 868-69. 

We are persuaded by these two views and hold that Machev may still be liable for her nonfeasance, in failing to keep her promise to keep the mansion well lit for the protection of Bourgonje, irrespective of the provisions of the lease.  This holding is consistent with the reasoning of the Illinois case of 
Jacob v. Greve
, 251 Ill. App. 3d 529 (1993).

In 
Jacob
, the plaintiff was injured when a fellow passenger on a tour bus had difficulty handling his carry-on bag, lost control of it, and struck the plaintiff on the head with it.  
Jacob
, 251 Ill. App. 3d at 532.  The plaintiff alleged that the tour company had a duty under its contract to assist tour members with their carry-on baggage.  
Jacob
, 251 Ill. App. 3d at 535.  The appellate court concluded "that plaintiff failed to present any facts to show that [the tour company] had a duty, pursuant to the contract, to assist with or supervise the loading and unloading of the carry-on luggage."  
Jacob
, 251 Ill. App. 3d at 535.  However, the court immediately thereafter held that "Even though [the tour company] 
did not have a contractual duty to act, if it voluntarily assumed the duty, its nonfeasance may give rise to liability if plaintiff relied on [the tour company] to act
."  (Emphasis added.)  
Jacob
, 251 Ill. App. 3d at 535.  The 
Jacob
 court thus conceded that if someone from the tour company made a separate promise from the original contract and failed to follow through it could be held liable, though it found that no one had, in fact, made such a promise to the plaintiff.  
Jacob
, 251 Ill. App. 3d at 535-36.
  See also 
N.W.
, 196 Ill. App. 3d at 1073-74 (considering potential tort liability though there was a lease between the plaintiff and the defendant).

We further note that, with the exception of the aged, pre-Second Restatement examples of failing to light a room, based on 
Stone
, 89 N.H. 329, 197 A. 713, and failing to attend as a physician, based on 
Randolph's Administrator
, 139 Ky. 159, 129 S.W. 562, all of the examples provided by Professor Keeton of where courts limited plaintiffs to contract relief, instead of tort relief, occurred in the context of cases involving purely economic damages.  See 
Farabee-Treadwell Co.
, 135 Tenn. 208, 186 S.W. 92; 
John Deere Co. of St. Louis
, 378 S.W.2d 496; 
Dawson Cotton Oil Co.
, 21 Ga. App. 688, 94 S.E. 1037; 
Mulvey v. Staab
, 4 N.M. 172, 12 P. 699; 
Ketcham v. Miller
, 104 Ohio St. 372, 136 N.E. 145; 
Chase v. Clinton County
, 241 Mich. 478, 217 N.W. 565; see
 also 
McDonald v. Century 21 Real Estate Corp.
, 132 Wis. 2d 1, 390 N.W.2d 68 (Wis. App. 1986) (refusing to impose a duty under the voluntary undertaking doctrine to allow recovery in tort in a failed real estate transaction); but see 
Coyle v. Englander's
, 199 N.J. Super. 212, 488 A.2d 1083 (1985) (holding there could be no tort recovery for a nightclub's breach of a contractual term to provide stagehands whose absence led to band manager sustaining physical injuries while loading sound equipment).  It is in this area regarding recovery for economic loss where the interplay between regulation by contract as opposed to tort considerations is most sensitive.  See 
Moorman Manufacturing Co. v. National Tank Co.
, 
91 Ill. 2d 69 (1982); 
Redarowicz v. Ohlendorf
, 92 Ill. 2d 171 (1982)
.

Machev contended below that courts should look to the underlying purpose of voluntary undertakings in determining what duties are assumed.  She argued that our supreme court held in 
Rowe
 that the underlying purpose of exterior lighting was not for security but for convenience, stating:  "The outside lighting and buzzers a[t] the property were not provided for security, but, instead, are common for apartment buildings as a convenience.  Their installation at the property cannot reasonably be regarded as an assumption of a duty to protect against third party criminal acts ***."  See 
Rowe
, 125 Ill. 2d at 218
 
("although [the landlord] may have provided illumination in the common areas, the furnishing of outside lighting is commonplace and furnished by virtually every landlord [of an office complex].  It cannot reasonably be regarded as the assumption of a duty to protect against criminal acts")
; accord 
N.W.
, 296 Ill. App. 3d at 1074 (citing 
Rowe
 and holding that since door locks were "commonplace and furnished by virtually every landlord" a landlord's promise to keep such locks in good repair did not amount to a voluntary undertaking to protect against criminal acts).  The circuit court appeared to accept these arguments in rendering its judgment.  We reject Machev's contention that the purpose of lights has been established for all cases, however,
 because the extent of a voluntary undertaking is not simply determined by the specific act undertaken but upon a reasonable assessment of its underlying purpose to be determined on a case by case basis.    

For example, in 
Nelson v. Union Wire Rope Corp.
, 31 Ill. 2d 69, 78-80 (1964), our supreme court recognized that safety inspections by an insurer could amount to a voluntary undertaking to make jobsites safe for workers if that was the insurer's intent and it took actions in accord with that intent, such as making safety recommendations to its insured; whereas, similar inspections solely for the purpose of establishing proper premiums would not amount to such an undertaking.  Likewise, the cases of 
Pippin v. Chicago Housing Authority
, 78 Ill. 2d 204 (1979); 
Berg v. Allied Security, Inc., Chicago
, 297 Ill. App. 3d 891 (1998), 
rev'd on other grounds
, 
193 Ill. 2d 186 (2000)
; 
Hill v. Chicago Housing Authority
, 233 Ill. App. 3d 923 (1992); and 
Taylor v. Hocker
, 101 Ill. App. 3d 639 (1981), all addressed
 the question of whether the presence of security guards amounted to a voluntary undertaking to protect tenants against criminal acts and reached different results.  The determinative factor in each of these cases was the purpose for which the security guards were retained as established in the hiring agreements.  In those cases where the agreements specified that the guards were intended to protect the tenants, liability attached; but, where it was specified that the guards' function was only to protect property, no liability attached.  Compare 
Pippen
, 78 Ill. 2d at 212 ("We conclude that Interstate assumed the duty, owed to persons lawfully on the Authority's property, of exercising reasonable care in the performance of its contracted obligation of 'protection of persons' "), and 
Berg
, 297 Ill. App. 3d at 904 ("the existence and scope of the duty are determined by looking to the extent of the voluntary undertaking. *** [T]he security measures that were implemented specifically included reducing the risk from assault.  Thus, as evidenced by the terms of their contract, the extent of their voluntary undertaking included protecting the plaintiff from an assault"),
 with 
Hill
, 233 Ill. App. 3d at 930 ("The affidavits presented by the CHA establish that it undertook only the protection of property.  Thus, since its duty is limited by the extent of that undertaking, it owed the plaintiff no duty to protect him from the criminal act by which he was injured"), and 
Taylor
, 101 Ill. App. 3d at 644 ("the lease provision relied upon by the plaintiffs does not, as in 
Pippin
, provide for the protection of third persons from criminal attacks").

Accordingly, in this case, under a favorable reading of Bourgonje's account, Machev specifically agreed to light the mansion in order to protect her from attacks late at night.  This conclusion is further supported by Machev listing the exterior lights as a security measure in her answers to Bourgonje's interrogatories.  Therefore, there is evidence to allow the conclusion that in this case providing the lighting was a voluntary undertaking of a security measure against assaults, and the circuit court's conclusion that there was no duty as a matter of law was reversible error.  

However, in defining the scope and extent of a voluntary undertaking in terms of its underlying purpose, we can detect no voluntary undertaking to provide security through the provision of the mansion's door buzzers and intercom system as claimed by Bourgonje in count II of her complaint.  In her motion for summary judgment, as well as on appeal, Machev contends that the evidence only shows that the door buzzers and intercom were a convenience.  In the face of this challenge, Bourgonje fails to provide counterevidence to show that the door buzzers and intercom system were provided for security, and, in particular, as a security device for alerting people inside the mansion that a person outside needed help.  Instead, Bourgonje appears to suggest that door buzzers inherently serve such a function, stating in her response to Machev's motion "buzzers are for communicating.  Carla tried to have someone help.  There was only silence."  In support of her position, Bourgonje cites to 
Tynan v. Willowdale Commercial Corp.
, 69 Misc. 2d 221, 223, 329 N.Y.S.2d 695, 698 (N.Y. Civ. Ct. 1972), which held that functioning bell and buzzer systems in apartment complexes were as important for health and safety as heat, water, light, electricity, sewage disposal and rodent infestation prevention because they provided "some deterrent to the criminal intruder."  However, under Illinois law, the existence and extent of voluntary undertakings are to be analyzed on a case-by-case basis.  
See 
Shea v. Preservation Chicago, Inc.
, 206 Ill. App. 3d 657, 663 (1990) 
("The proper inquiry is to determine whether, 
on a case-by-case basis
,
 
*** the circumstances demonstrate that the landlord, by retaining access to or control over the premises, assumed a duty to protect tenants against reasonably foreseeable third-party criminal attacks" (emphasis added))
.   In accord with this principle, we previously demonstrated that the use of the same devices, depending on the surrounding circumstances, might or might not amount to an undertaking to provide security for a plaintiff.  Therefore, citation to a broad holding, such as that in 
Tynan
, cannot relieve Bourgonje of her burden of production of evidence in this summary judgment proceeding.  Moreover, in our view, the most logical deterrent to crime created by door buzzers/intercom systems would be the building entrance remaining locked unless a resident elected to admit the person attempting to buzz in, with the corresponding safety benefit enuring to the residents inside, not from the buzzers serving as an alarm with the safety benefit enuring to persons outside the premises.   Since Bourgonje has failed to present evidence allowing for us or the court below to infer that Machev undertook to protect Bourgonje against assaults through provision and maintenance of the door buzzers and intercom system, summary judgment on count II was proper.  

2.  
Could Bourgonje Have Reasonably Relied on Machev's Promise?

There still remains to be determined whether there was sufficient reliance by Bourgonje on Machev's promise for liability to attach for her nonfeasance.  To begin, we note that summary judgment would not have been  procedurally proper on this issue in the circuit court as Machev never contested Bourgonje's allegations of reliance presented in her complaint, nor, for that matter, does she now.  See 
Williams
, 316 Ill. App. 3d at 688
.  Moreover, we think there is sufficient evidence to allow an inference that Bourgonje, in fact, reasonably relied on Machev's promise.

"Reliance may reasonably be placed where there is a deceptive appearance that performance had been made, or where a representation of performance has been communicated to plaintiff by defendant, or where plaintiff is otherwise prevented from obtaining knowledge or substitute performance of the undertaking."  
Chisolm
, 47 Ill. App. 3d at 1007; see also 
Roberson v. J.C. Penney Co.
, 251 Ill. App. 3d 523, 527 (1993) (citing 
Chisolm
).  Moreover, "to justify reliance, [a] plaintiff must be unaware of the actual circumstances and not equally capable of determining such facts."  
Chisolm
, 47 Ill. App. 3d at 1007; 
Roberson
, 251 Ill. App. 3d at 527.

We see that Bourgonje presented sufficient evidence of reliance in this case to preclude summary judgment.  We note the factual similarity of this case to that of 
N.W.
, where the court held:

"The plaintiff has made a sufficient showing of reliance.  There was a promise by the landlord to maintain the locks in proper working condition at all times to prevent entry by unauthorized persons.  This promise induced the plaintiff to sign a lease with the defendants.  Further, there were repeated assurances by the building management that repair would be effected, thereby inducing the plaintiff to remain in her apartment and forego the opportunity to take safety precautions of her own."  
N.W.
, 196 Ill. App. 3d at 1073.  

See also 
Reider v. Martin
, 359 Pa. Super. 586, 592-93, 519 A.2d 507, 511 (1987) ("Appellees clearly had no preexisting duty to supply their tenants with a functional front door lock.  Appellees, however 'assumed the duty' by consistently promising to remedy the situation, thereby fostering a possible 'reliance by [their] tenants on [their] efforts' " [Citation.]).  So too here, we think there is evidence from which to infer that Bourgonje entered her lease with Machev at least in part because of her promises surrounding the lights, remained at the mansion out of a reasonable expectation of their imminent repair, and therefore forsook the opportunity to undertake her own safety precautions.

Admittedly, a point does arise at which, after promises have been repeatedly broken, a plaintiff may no longer reasonably rely on them.  See 
McCoy v. Chicago Housing Authority
, 333 Ill. App. 3d 305 (2002).  For example, in 
McCoy
, a mother alleged that the CHA had voluntarily undertaken to fix the locks on the windows of her apartment, prior to her daughter falling out of a window, by repeatedly promising to make such repairs over the course of several years, and that she relied on those promises.  
McCoy
, 333 Ill. App. 3d at 307.  Approximately one month before the fall, the CHA informed her that it did not have the manpower to make the requested repairs.  
McCoy
, 333 Ill. App. 3d at 307.  When the daughter fell from the window, the mother was visiting a relative to arrange for further complaints to the CHA about the apartment.  
McCoy
, 333 Ill. App. 3d at 308.  When asked in her deposition why she subsequently moved out of her apartment, the mother explained " 'Because they wasn't doing nothing and my baby fell out the window.  They wasn't coming. * * * .  They wouldn't come out there and do nothing for it.' "  
McCoy
, 333 Ill. App. 3d at 308.  Reviewing these facts, the 
McCoy
 court held:

"Over the course of several years, the CHA repeatedly failed to fulfill promises that it would make the repairs.  A month prior to the incident, CHA personnel specifically told Jones that the CHA would not make repairs to the apartment because it lacked manpower.  Most significantly, Jones' statement that she was still attempting to call the CHA to fix the problems on the date the accident occurred indicates that she did not expect the CHA to fulfill its earlier retracted promise.  Thus, [the record] provides no evidence from which to infer that she possessed an expectation that the CHA would repair her window locks at the time of the accident."  
McCoy
, 333 Ill. App. 3d at 310-11.

Here, however, though Bourgonje was aware that Machev initially broke her promise, by not having the lights functioning at the time of her move in, this was followed by another promise to repair the lights, with the attack occurring only a short time later.  The entire period between Machev's initial promise and the attack was approximately two months.  The period between Machev's last promise before the attack and the attack itself appears, at most, to have only been a little more than two weeks.  Thus, we do not see myriad broken promises, over an extended period of time, like in 
McCoy
, that would justify a legal conclusion that Bourgonje could not have reasonably continued to rely on Machev's promises of repair.

Moreover, it is reasonable to infer that Bourgonje was precluded from undertaking substitute performance.  We do not perceive this case to be akin to 
McCoy
, where there were clearly identifiable options available to the tenant to remedy her situation.  See 
McCoy
, 333 Ill. App. 3d at 311-12 (mother's bare assertion that she relied on the CHA's promises was "devoid of any suggestion that CHA's promise induced [her] to forgo other remedies such as fixing the window lock herself, asking her brother or another person to fix it, pursuing legal action, or seeking other housing.  Alternatively, she [did] not state she was forced to rely on the CHA's promise because lack of time, skill, or resources foreclosed her from pursuing these or other potential remedies").  As a person whose known background suggests no electrical skills, Bourgonje could not reasonably be expected to repair the lights herself.  Likewise, legal action or breaking the lease, so early into the tenancy, appears wholly unreasonable.  Although it is conceivable that Bourgonje might have received Machev's permission, as required under the lease, to have work performed on the mansion's fixtures by an electrician she would arrange for, this action cannot be reasonably expected at a time when she was still entitled to rely on her landlord's promise to make such repairs

C.  Proximate Causation

Machev still contends, however, that there is no evidence that would allow a finding that any breach of the undertaking proximately caused Bourgonje's injuries.  
"Proximate cause requires the plaintiff to show that the defendant's negligence was (1) the actual cause or the 
cause
 in 
fact
 of his injury, 
i.e.
, 
but for
 the defendant's conduct, the accident would not have occurred; and (2) the legal cause of his injury, 
i.e.
, the defendant's conduct was so closely tied to the plaintiff's injury that he should be held legally responsible for it.
"  
McCraw v. Cegielski
, 287 Ill. App. 3d 871, 873 (1996).
  Proximate cause "must be established to a reasonable certainty," and may not be "based upon mere speculation, guess, surmise or conjecture."  
Castro v. Brown's Chicken & Pasta, Inc.
, 314 Ill. App. 3d 542, 553 (2000).  However, reasonable inferences supported by circumstantial evidence may support a finding of proximate cause.  
McCraw
, 287 Ill. App. 3d at 873.

Machev first argues that there is no proximate cause because Delgado's attack was an independent, intervening act which she could not foresee occurring as the result of her failure to repair the lights.  While at one time 
criminal acts were presumed unforeseeable
, the law has developed to recognize that criminal acts may become foreseeable in a variety of circumstances so that liability may still attach to a landowner.  Compare, generally, 
Altepeter v. Virgil State Bank
, 345 Ill. App. 585, 603 (1952) ("An independent act of negligence or wilfulness by a third person is an occurrence which a defendant is not bound to anticipate"), with 
Duncavagev. Allen
, 147 Ill. App. 3d 88, 96 (1986) ("proximate cause may be treated as a matter of law in undisputed fact situations in which a court has deemed an intervening event to be so unforeseeable that the first wrongdoer could not have reasonably anticipated a third party to act and cause harm to another. ***  [H]owever, if the criminal act might reasonably have been foreseen at the time of the negligence, the causal chain is not automatically or necessarily broken"); see also
 
Neering v. Illinois Central R.R. Co.
, 383 Ill. 366, 376-77 (1943) (holding criminal acts to be foreseeable when persons prone to criminality are known to loiter near a premises); 
Ney v. Yellow Cab Co.
, 2 Ill. 2d 74 (1954) (holding criminal acts foreseeable based on the defendant's creation of a condition that facilitates the crime); 
Stribling v. Chicago Housing Authority
, 34 Ill. App. 3d 551 (1975) (holding criminal acts to be foreseeable based on the occurrence of prior criminal acts on the premises)
.
  We find such circumstances in this case.  Moreover, like other questions of proximate cause, the existence of intervening causes is generally a question for the jury.  See 
Maskaliunas v. Chicago & Western Indiana R.R. Co.
, 
318 Ill. 142, 148-49 (1925); 
Mack v. Ford Motor Co.
, 283 Ill. App. 3d 52, 57 (1996). 

We start by noting that Machev's contention is undercut by Bourgonje's account of her initial conversations with Machev.  According to Bourgonje, Machev fully concurred that full exterior lighting was important in order to prevent attacks on single women.  Necessarily, then, she would also have understood that the prevailing darkness could facilitate such an attack.  
Rowe
, 125 Ill. 2d at 224 ("a landlord may be held liable for harm to a tenant *** if its negligence facilitates the criminal acts of a third person and the criminal activity is reasonably foreseeable").  Moreover, at least one Illinois court has held that a third-party criminal attack becomes foreseeable by a landlord undertaking to guard against such attacks, but negligently doing so.  See 
Ignarski v. Norbut
, 271 Ill. App. 3d 522, 526 (1995); see also 
Union Park Memorial Chapel v. Hutt
, 670 So. 2d 64, 67 (Fla. 1996) ("
Voluntarily undertaking to do an act that if not accomplished with due care might increase the risk of harm to others or might result in harm to others due to their reliance upon the undertaking confers a duty of reasonable care, because it thereby 'creates a foreseeable zone of risk.' [Citation.]").
  

Additionally, there is evidence in the record to support an inference that the area surrounding the mansion was dangerous enough so that Machev should have known that an attack such as that experienced by Bourgonje was likely.  Detective Hart testified that less than a mile south of the mansion there was a halfway house for newly released prison inmates, as well as a nearby transient hotel on Milwaukee Avenue, both of which "add[ed] an element of risk to the area."  According to Hart, community relations personnel in the department would communicate to community groups about the need to increase neighborhood security when such establishments were in the area.  As our supreme court said in 
Neering v. Illinois Central R.R. Co.
, 383 Ill. 366, 376-77 (1943):

"The law recognizes, and it is generally understood, that where lawbreakers congregate they are dangerous to society and are likely to break other laws, and we do not see how it could reasonably be said when vagrants are permitted to congregate they will not become a menace to the public peace or that under such conditions one could not reasonably anticipate they might commit some unlawful act or become dangerous to society."

Moreover, there was testimony that there was a significant amount of violent crime in the vicinity of the mansion.  Detective Thaxton explained that there were probably about 10 community alerts for District 14 in 2001 for sex crimes, with at least half issued prior to the attack on Bourgonje, and that there were "a lot of violent crimes that occur within that area," such as "street robberies, businesses being robbed and things of that sort."  Ligas testified that there was a history of violent sexual crimes prior to the attack on Bourgonje that became the subject of meetings, notices and fliers of the Logan Square Concerned Citizens, including "numerous rapes," although the only specific crime he could recall leading to a community alert was an incident involving the beating of prostitutes.  See 
Ignarski
, 271 Ill. App. 3d at 526 ("Generally, foreseeability is established through prior criminal attacks on the premises").  

Likewise, we have ample evidence of the causal relationship of lighting on property and criminal activity.  Ligas explained in his deposition that his organization advised homeowners to light their premises throughout the night because "[i]t's been proven that lighting definitely assists in the dropping of crime or reduction of crime" because "criminals tend[] to sort of go to the place of least resistance, and lighting brings attention."  Similarly, Detective Hart testified that "[i]t's kind of a known fact that lighting seems to make it a – place more secure and deter a crime.  The fact that no lights did come on when they went back there could have, in all likelihood, embolded [
sic
] him [Delgado], made him braver."  Further, courts have recognized inadequate lighting as making criminal activity foreseeable.  See 
Duncavage
, 147 Ill. App. 3d at 97 ("poor or nonexistent" lighting, among other factors, precluded a finding that a criminal attack was an unforeseeable intervening cause); 
Kenny v. Southwestern Pennsylvania Transportation Authority
, 581 F.2d 351, 355 (3rd Cir. 1978) ("The presence of adequate lighting is recognized as a discouragement to violent criminal activity ***.  Traditionally, adequate street lighting has been advocated as an effective means of reducing crimes against the person, such as robbery, assault and rape"); 
Johnston v. Harris
, 387 Mich. 569, 198 N.W.2d 409 (1972) (lack of lighting and locked entrance to apartment building vestibule made criminal assault on tenant foreseeable); 
Slapin v. Los Angeles International Airport
, 65 Cal. App. 3d 484, 489, 135 Cal. Rptr. 296, 299 (1977); 
Atamian v. Supermarkets General Corp.
, 146 N.J. Super. 149, 369 A.2d 38 (1976) (lack of security, including inadequate lighting, and occurrence of prior attacks, made subsequent attack foreseeable).     

 
 Machev still argues, however, that there is no evidence to establish that her alleged negligence was a cause in fact of Bourgonje's injuries, or that "but for" such negligence, the attack would not have occurred.  Specifically, Machev contends "[t]here is no evidence that Delgado knew Bourgonje, where she lived, or anything about Machev's property before the attack.  If Bourgonje had lived elsewhere, it is just as likely that the attack would have taken place elsewhere."  We cannot agree.

The parties attempted to take the deposition of Juan Delgado, who was arrested, tried and sentenced for the rape of Bourgonje.  Delgado told the parties' attorneys that he wanted to consult a lawyer and would answer most questions by stating an objection under the fifth amendment.  He was willing, however, to authenticate his confession for the attack on Bourgonje as recorded by the State's Attorney.  In the confession, Delgado explained that he originally sought only to find a skinny, older woman to rob in his neighborhood.  However, as he was attacking Bourgonje, he changed his mind and decided to rape her.  Delgado explained to the assistant State's Attorney "that he then told her to open up the gate so he could drag the woman back to someplace that was dark and no one could see him rape her," explaining "he had to go around the building to the back of the building where there was a staircase" and "that he did get back to that staircase," where he completed his robbery and rape.
  These final statements, 
that "he then told her to open up the gate so he could drag the woman back to someplace that was dark and no one could see him rape her," and that "he had to go around the building to the back of the building where there was a staircase" and "that he did get back to that staircase," allow the inference that, even if he was unaware of the fact that the exterior of the mansion was unlit prior to commencing the robbery, he subsequently elected to rape Bourgonje because of his ability to operate in darkness on the mansion grounds.  This potential inference mandates that the issue of causation be put to a jury.  
See 
Duncavage
, 147 Ill. App. 3d at 96-98 (holding that causation of a criminal attack could not be determined in favor of the landlord/defendant as a matter of law, in part, because there was evidence that the attacker chose to make his attack on the premises because of its dilapidated condition, including burnt-out exterior lights); 
Kenny
, 581 F.2d at 355 
("If further evidence of the connection between criminal activity and lack of lighting were needed, the fact that the assailant dragged the plaintiff to a darkened area supplied it.  Whether inadequate, indeed nonexistent, lighting was a substantial factor in bringing about harm to the plaintiff was a matter for the jury to resolve"); see also 
Jardel Co. v. Hughes
, 523 A.2d 518, 527 (Del. 1987) (holding criminal perpetrators' testimony surrounding their movements and planning to be "clearly material to the question of whether the presence of additional security might have prevented the attack").  Moreover, if it were established at trial that Delgado made such a decision, it would be immaterial that the attack began on the sidewalk.  

Thus, there is more than enough evidence to create a question of fact as to whether the assault on Bourgonje was a foreseeable result of Machev's alleged failure to fulfill her voluntary undertaking to illuminate the premises.

Machev still argues, however, that the sunken alcove would have remained unlit, even with the exterior lighting fully
 functioning, so that the rape would have occurred even if Machev had completed her undertaking.  Bourgonje counters that there is an issue of fact as to whether the functioning of the existing exterior lighting would have stopped Delgado prior to reaching the sunken alcove.  We agree with Bourgonje.  This conclusion is corroborated by Machev's testimony that she overheard Bourgonje tell the police that as she and Delgado "went around the corner, the light did come on and he was startled but it wasn't long enough," indicating that the existing exterior lights, if functioning, might well have deterred Delgado from culminating his plan to rape Bourgonje.  See 
Berg
, 297 Ill. App. 3d at 904 ("the attacker fled at the sound of [a car] horn; thus, whether the guards' presence would have been a sufficient deterrent, in spite of an inability absolutely to control access to the parking lot and an alleged lack of 'authority to intervene' or act as police, is a question for the trier of fact"); 
Slapin
, 65 Cal. App. 3d at 489, 135 Cal. Rptr. at 299 ("That a mugger thrives in dark places is a matter of common knowledge"). 

III.  Conclusion

For the foregoing reasons, we conclude that a jury must be allowed to determine whether Machev promised to light the premises of the mansion in order to protect Bourgonje from criminal attacks; whether Bourgonje relied on that promise; whether Machev unreasonably failed to fulfill her promise; and whether any breaking of that promise proximately caused Bourgonje to suffer the rape.  We feel compelled to briefly respond to our colleague's impassioned special concurrence.  Contrary to its characterization of our majority decision, we, on our part, do not purport to comment or editorialize with respect to what is or should constitute the substantive rights or obligations of landlords or, for that matter, tenants.  Rather, the basis and rationale of our majority opinion rests upon our construction and interpretation of the voluntary undertakings doctrine as applied in the underlying summary adjudication.  In that context, we have concluded that material issues of fact are present which should not be resolved summarily.  We do not believe that we should comment, at this stage of the proceedings, as to how the trier of fact should ultimately weigh or evaluate the evidence when it is presented at trial.  We, nevertheless, welcome the consensus of the entire tribunal in holding that summary judgment was inappropriate in the face of material issues of fact remaining for determination by the trier of fact.  We, therefore, affirm the entry of summary judgment on count II of the complaint; reverse the entry of summary judgment on count I of the complaint; and remand for further proceedings in accord with this order.

Affirmed in part and reversed in part; cause remanded. 

CAHILL, P.J., concurs, O'MALLEY, J., specially concurs.

O'MALLEY, J., specially concurring:

I concur with the majority
=
s conclusion that this case presents disputed issues of material fact which cannot be resolved on a motion for summary judgment.  Each of us, however, has reached this conclusion through such a widely divergent interpretation of the facts in this case that a separate concurrence seems in order.  I also write out of concern for what I view as the erosion of a very sensible legal principle, namely that a landowner is not generally liable for the criminal acts of third parties.

In the instant case, plaintiff Bourgonje sued defendant Machev under a theory of negligence.  A threshold question here, as in any cause of action for negligence, is whether defendant owed plaintiff a duty.  See 
Puttman v. May Excavating Co.
, 118 Ill. 2d 107, 116 (1987) (
A
Necessary to any recovery based on negligence is the existence of a duty to conform to a certain standard of conduct for the protection of the plaintiff.
@
), citing 
Barnes v. Washington
, 56 Ill. 2d 22, 26 (1973).   It is axiomatic that if one owes no duty to another, then there is no cause of action in negligence between the two.  
Dunn v. Baltimore & Ohio Railroad Co.
, 127 Ill. 2d 350, 365 (1989) (existence of a legal duty is a requirement of any cause in negligence).  As the majority opinion notes, the Illinois Supreme Court has recognized that as a matter of course, a landlord does not owe any special duty to a tenant to protect the tenant from the criminal acts of a third party.  
Rowe v. State Bank of Lombard
, 125 Ill. 2d 203, 214 (1988).

Despite this general rule, we remand this case back to the circuit court because the record contains some evidence which could permit a trier of fact to conclude that a voluntary undertaking occurred where defendant allegedly promised to maintain the external lighting at 2410 North Kedzie as a security measure.  See 
N.W. Amalgamated Trust and Savings Bank
, 196 Ill. App. 3d 1066, 1072-73 (holding that a landlord owed a legal duty to a tenant when the landlord voluntarily undertook actions to protect the tenant from the actions of or presence of unauthorized persons).  In the instant case, the plaintiff alleges that defendant acknowledged that the external lights were an important safety feature and promised to keep the grounds well-lit, thought defendant denied making any such promise to plaintiff.  This conflict can only be resolved by determining the credibility of the respective witnesses; credibility determinations are always questions of fact.  
Congregation of the Passion v. Touche Ross & Co.
, 159 Ill. 2d 137, 170-71 (1994) (
A
The credibility of witnesses and the weight to be given their testimony are matters for the jury to determine ***.
@
).  The question is material in this case because a finding of fact is necessary before one could say that a duty exists (
Puttman
, 118 Ill. 2d at 116), thus it is appropriate to remand this matter to the circuit court.  
Wood v. National Liability & Fire Insurance Co.
, 324 Ill. App. 3d 583, 585 (2001) (summary judgment should be denied if there exists disputed issues of material fact).

It is critical to note, however, that if there had been no evidence that defendant made an explicit promise to the plaintiff to maintain the external lights at 2410 North Kedzie, the defendant landlord would have owed no special duty of care to the plaintiff.  The Illinois Supreme Court has recognized that a landlord who provides a property with external lighting, door locks, buzzers, or similar general security-related features is not engaging in a 
A
voluntary undertaking
@
 that creates a legal duty; such features are routinely provided by landlords as a matter of course and thus do not create any special or elevated duty owed to the tenant.  See 
Rowe
, 125 Ill. 2d at 218 (noting that providing external lighting at a property is commonplace and furnished by virtually every landlord to every tenant and thus 
A
cannot reasonably be regarded as the assumption of a duty to protect against criminal acts
@
).  I therefore agree with a remand only because the record in this case contains a unique piece of evidence, namely the plaintiff
=
s allegation that defendant promised to keep the grounds at 2410 North Kedzie well-lit.  Absent evidence of this purported promise, it would be improper to find a duty existed merely because the landlord provided external lighting.  
Rowe
, 125 Ill. 2d at 214, 218.  To hold otherwise would swallow the general rule that a landlord is not liable for the criminal actions of a third party and would seriously undermine basic principles of premises liability.  See 
Petrauskas v. Wexenthaller Realty Management, Inc.
, 186 Ill. App. 3d 820, 829 (1989) (finding that a landlord owed no duty to a tenant who was injured by an intruder who gained entry to an apartment through a propped-open fire door; this court held that the landlord owed no duty to any tenant to keep fire escape doors closed, a laundry room window open, or hallway lights on; 
A
[t]o impose a duty in this case would serve to greatly expand the scope of a landlord
=
s duty almost to the point of abolishing the general rule that a landlord has no duty to protect his tenants from the criminal acts of third persons
@
).

If the trier of fact determines that based upon these facts a duty exists, the next inquiry concerns whether defendant breached this duty.  It is here that my interpretation of the facts differs significantly from that of the majority.  The record shows that plaintiff met with defendant in late July or early August 2001 and signed her lease sometime in early August 2001.  Plaintiff had numerous discussions with defendant regarding improvements to the apartment, such as paint colors, as well as conversations about the history of the building.  Plaintiff claims that during one of these conversations she spoke with defendant regarding the need for good lighting on the property.  Although defendant denies it, according to plaintiff, defendant stated that, as a fellow single woman, she appreciated the connection of lights to security and also made assurances that the lights on and around the building would be maintained.  At this time there was no indiction that the lights around the building were inoperable.  It is only after plaintiff moved in, during a three day period between September 10 to 13, 2001, that the plaintiff noticed that some of the lights were not functioning, it was 
A
too dark,
@
 and plaintiff felt some timed lights went on and off at inappropriate intervals.  The plaintiff claimed that she also notified the defendant of the lighting problem.  The handyman testified that he was notified of the problem by plaintiff, 
A
right after Carla moved in,
@
 or 
A
about two weeks
@
 before the attack which is roughly the same two to two and one-half week time period.  The notification could have been even later because at one point, plaintiff testified she notified defendant sometime between September 13 to 20, 2001.  Although the handyman testified that was able to do some electrical work such as installing fixtures, he attempted to fix the lights but was unable to do so.  Within several days he informed defendant of this.  According to the handyman, defendant then responded that she would find an electrician to repair the lights.  An approximation of this time frame favorable to the plaintiff would bring us to at least the 16
th
 or 17
th
 of September.  Nonetheless, defendant maintained that she did not remember these events and first learned of the problem with the lights on October 2, 2001, when plaintiff delivered a letter to her apartment building on that day.

Based upon the foregoing facts, the majority appears to have concluded that there was a breach of duty (assuming one exists) because it characterized this case as one of 
A
nonfeasance,
@
 that is, a failure to do a voluntary undertaking altogether where the plaintiff relied on that undertaking.  See 
Vesey v. Chicago Housing Authority
, 145 Ill. 2d 404, 419 (1991); 
N.W. v. Amalgamated Trust and Savings Bank
, 196 Ill. App. 3d 1066, 1073 (1990) (a plaintiff could recover for nonfeasance if he showed 
A
(1) a promise by the defendant to do an act or to render a service; (2) reliance upon the defendant's promise; and (3) injury which was the proximate result of the defendant's omission to perform the voluntary undertaking
@
); 
Chisolm v. Stephens
, 47 Ill. App. 3d 999, 1007 (1977); 
Stephen v. Swiatkowski
, 263 Ill. App. 3d 694, 704 (1994).  The majority also notes that 
A
there appears to be evidence of misfeasance [performing a voluntary undertaking negligently] in the record as well.
@
  See Restatement (Second) of Torts 
'
 323(a), (b) (1965); 
Cross v. Wells Fargo Alarm Services
, 82 Ill. 2d 313, 317 (1980).  I disagree with the majority that the evidence here supports a conclusion that this is a case of nonfeasance, since it is clear from a reading of record that is more favorable to the plaintiff that defendant undertook to repair the lights through her handyman virtually immediately after she was informed that something was wrong with the lights.  Moreover, I completely reject the notion that it is 
A
misfeasance
@
 to first contact a handyman instead of an electrician as the majority concludes without citation.  I offer the following observations also without citation.  Most property owners keep touch with handymen who are capable of doing simple plumbing, carpentry, and electrical work.  Generally, I think it is only common sense to observe that a property owner does not usually summon a $38 per hour plumber, at least initially, to clear a clogged toilet in a tenants
=
 apartment.  So, too, the defendant here was not required to immediately summon a electrician to fix some unknown problem with the lights which may have been merely burned out bulbs or a simple timer malfunction.  According to the majority, further misfeasance occurred where defendant 
A
failed to properly call an electrician when Troche informed her that he could not repair the lights.
@
  Following the majority
=
s lead into the land of opinion, I believe most reasonable people would not regard malfunctioning lights as an emergency requiring immediate action, such as a malfunctioning furnace in mid-winter.  Defendant needed a few days to locate and contact an electrician.  In my view, there is no suggestion of misfeasance in this record.

With regard to nonfeasance, it is notable that the majority stresses there is a 
A
two month
@
 time frame in which this purported nonfeasance occurred, presumably from the date of the voluntary undertaking  in early August 2001 until the attack on October 2, 2001.  It is puzzling to me how defendant
=
s conduct could be called nonfeasance because, as previously noted, defendant acted promptly by having her handyman attempt to repair the lights after being notified that they were not working.  The majority
=
s opinion implies that the defendant owed a duty from the time of the purported promise to 
inspect
 the lights rather than simply a duty to 
repair
 the lights upon request from a tenant.  There is no support in the law for such a proposition and at least one Illinois case has held that a promise to repair and maintain does not amount to a duty to a duty to 
A
police
@
 the grounds.  See 
N.W.
, 196 Ill. App. 3d at 1074 (
A
The landlord's duty to keep the common areas of the building in a reasonably safe condition is customarily regarded as an obligation to maintain and repair, not to police.
@
).  Such a rule would be an impermissible expansion of the duty of landlords.  See 
N.W.
, 196 Ill. App. 3d at 1074-75 (rejecting plaintiff
=
s argument to find a landlord liable for failing to police grounds or protect tenants from actions of third-party criminals).  In any event, this defendant would have fulfilled any duty to inspect where she hired a handyman who was 
A
frequently
@
 at the building and worked for her 
A
five days a week,
@
 including engaging in routine repairs of the building and its grounds.  In short, should a jury decide that defendant owed plaintiff a duty, there is scant evidence of any breach.  I acknowledge, however, that there exists a question of fact as to whether defendant
=
s conduct in the two weeks before the attack was reasonable.

The final element to consider is proximate cause.  See 
N.W.
, 196 Ill. App. 3d at 1071 (noting that in an action for negligence, a plaintiff must set out facts establishing, 
inter alia
, that the defendant
=
s alleged breach of duty proximately caused plaintiff
=
s injury).  Like the trial judge, I think the evidence concerning this element is largely speculative.  The term proximate cause describes two distinct requirements, cause in fact and legal cause.  
Harrison v. Hardin County Community Unit School District No. 1
, 197 Ill. 2d 466, 476 (2001).  Cause in fact exists where there is a reasonable certainty that a defendant's acts caused the injury or damage.  A defendant
=
s conduct is a cause in fact of the plaintiff
=
s injury only if that conduct is a material element and a substantial factor in bringing about the injury.  A defendant's conduct is a material element and a substantial factor in bringing about an injury if, absent that conduct, the injury would not have occurred. 
Harrison
, 197 Ill. 2d at 476.  
A
Legal cause,
@
 by contrast, is essentially a question of foreseeability. 
Harrison
, 197 Ill. 2d at 476-77.  The relevant inquiry concerning legal cause is whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct.  See 
Yates v. Shackelford
, 336 Ill. App. 3d 796, 803 (2002).

Thus, to determine whether defendant
=
s actions constituted 
A
cause in fact
@
 in the instant case, one must look to whether defendant
=
s purported failure to have the lights repaired more promptly was a substantial factor in causing plaintiff
=
s injury.  Unlike the majority, I view the evidence presented as gossamer thin.  There is little or no evidence to establish that the attack would not have occurred if all the lights were operating and a question as to whether the situs of the rape would have been illuminated even if the lights were working.  Would there then be a duty to light every square inch of the grounds?  Moreover, the perpetrator, who stated that he first intended only to rob plaintiff, attacked plaintiff outside the building grounds on a city street.  It is a reasonable inference from the evidence that since it was late in the evening, street lights were on.  Thus, in all likelihood, the criminal began his attack in some light, so the mere presence of light was not enough to deter his initial crime.  In what appears to be a spontaneous chain of events, the criminal became aroused during the mugging and decided to rape the plaintiff.  The criminal said in his confession that he took Bourgonje to a 
A
dark place
@
 to accomplish this.  Plaintiff was not specifically singled out ahead of time as a being vulnerable because her home lacked adequate lighting.  The criminal act in this case appears to be completely random as is the choice of a 
A
dark place
@
 on defendant
=
s property as opposed to any other nearby property.  

As previously noted, legal cause rests on the principal that the crime is foreseeable to a reasonable person.  
Harrison
, 197 Ill. 2d at 476-77; 
Yates
, 336 Ill. App. 3d at 803.  To support her contention that the crime was foreseeable, plaintiff offered what amounts to hearsay or at least anecdotal evidence from two local policemen and a member of a neighborhood watchdog group.  They testified that this was a 
A
high crime
@
 area, that there had been 
A
numerous rapes
@
 in the area, that someone had discharged a firearm across the street from the building, and that there had been five community alerts in the District prior to October 2, 2001.  We have no way of knowing whether five is a high number or a low number of community alerts for similarly situated communities, or how 
A
numerous
@
 numerous rapes are.  Consequently, the question remains, 
A
high crime
@
 means high compared to what?  Similar evidence that the property in that case was in a higher crime area was rejected by the court in 
Petrauskas
 as being unrelated to the land owner
=
s building.  
Petrauskas
, 186 Ill. App. 3d at 827 (
A
In the present case, plaintiff alleged that the building was in a 
A
high crime
@
 area and that a person was fatally shot across the street from the building.  These allegations of criminal activity have no connection to the building [in question].
@
).  Random, violent street crime is a generally foreseeable and an unfortunate fact of urban life but the above evidence, in my view, does not prove that this defendant was responsible for foreseeing the crime in question.

In the first place, there is no indication that defendant ever 
knew
 about any of the above information.  There had been no previous violent crimes on the property in question, defendant did not live in this area, and she did not belong to neighborhood groups such as C.A.P.S.  Thus, there is no reason that defendant should have been alerted to the impending crime based upon the testimony of plaintiff
=
s witnesses.

If one rejects, as did the court in 
Petrauskas
, the speculative, anecdotal, evidence concerning the purported 
A
high crime
@
 rate of the neighborhood, the only evidence of proximate cause is the perpetrator
=
s statement that he took plaintiff to a 
A
dark place
@
 so that no one would see him rape her.  To illustrate how random this act was, it appears that the criminal himself did not even foresee the more violent aspect of his crime in that he stated that he initially set out only to rob plaintiff, then, in what seems to be a split second decision, decided to rape her as well.  Thus, unlike the majority, I would not say there is 
A
more than enough
@
 evidence to establish a question of fact regarding proximate cause.  Although I find that the evidence raises an issue of fact, it hangs on the questionable word of a convicted criminal.

Finally, I am concerned about what I regard as an erosion of an entirely reasonable rule protecting landowners from liability for the criminal acts of others.  The majority might argue the case simply follows established exceptions to the rule, conferring liability for voluntary undertakings as was done in 
Rowe
, and I acknowledge that it does.  The Supreme Court in 
Rowe
, however, stated that no duty arises when a landlord simply provides external lights, though here the majority thinks that a purported promise to 
maintain
 those lights may be sufficient for liability to accrue.  I fear that the next case may continue to expand this exception even further, holding that the brightness, placement, or type of light may be deemed inadequate and thus liability will attach.  Eventually, the exception will become the rule.

Moreover, as a matter of public policy, any expansion of the exception would prove such a burden on land owners that it would effectively deter any owner from ever providing even minor improvements at his property for the security and convenience of his tenants.  See 
Petrauskas
, 186 Ill. App. 3d at 829 (even if the financial cost of upkeep of security features to a building is relatively low, to expand the duty landlords owe to tenants merely because landlords provide certain basic security features in a building would place an unfair burden on landlords and would 
A
expand the scope of a landlord
=
s duty almost to the point of abolishing the general rule that a landlord has no duty to protect his tenants from the criminal acts of third persons
@
).

FOOTNOTES
1:  We do note that there appears to be evidence of misfeasance in the record as well, however.  Troche testified that Machev instructed him to repair the lights, though he had no qualifications as an electrician, and without even providing him with the necessary information to make a reasonable attempt, such as the location of the timers, and then failing to promptly call an electrician when Troche informed her that he could not repair the lights himself.