JENNY FAN, Special Adm'x of the Estate of Ru Hai Liu, Deceased, Plaintiff-Appellant, v. AUSTER COMPANY, INC., *et al.*, Defendants-Appellees.

First District (1st Division)    No. 1—07—2604

Opinion filed March 30, 2009.

Michael W. Rathsack, of Chicago (James M. Harman and Michael W. Rathsack, of counsel), for appellant.

Cassiday, Schade LLP, of Chicago (Thomas P. Boyland, Denise P. Erlich, and Julie A. Teuscher, of counsel), for appellees.

PRESIDING JUSTICE ROBERT E. GORDON delivered the opinion of the court:

On April 22, 2003, Ru Hai Liu fell down an open elevator shaft and died. Liu worked for Yong Shing Wholesale Trading Company, which subleased the premises from defendant Auster Company. Defendant Auster Company had leased the premises from the owner of the building, defendant Auster Trust. Plaintiff Jenny Fan, who is the special administratrix for Liu's estate, sued defendants Auster Company and Auster Trust alleging that they negligently allowed an unguarded opening to exist, failed to provide elevators with an interlock to prevent the doors from opening if the elevator was not present, and failed to inspect the elevator doors to assure that the interlocks were operating. The employer, Yong Shing,[1] was not named as a defendant, since the deceased's exclusive remedy against his employer was that provided by the Workers' Compensation Act. 820 ILCS 305/1 et seq. (West 2006); Wright v. Mr. Quick, Inc., 109 Ill. 2d 236, 237 (1985) (employer "could not be named as a defendant").

Defendants Auster Trust and Auster Company moved for summary judgment on the ground that the sublease placed the responsibility for maintaining the elevator on Yong Shing, the sublessee. On August 20, 2007, the circuit court of Cook county entered summary judgment in favor of defendants. On September 13, 2007, plaintiff filed a notice of appeal, and this appeal followed. For the reasons discussed below, we reverse the trial court's order and remand for further proceedings consistent with this opinion.

## BACKGROUND

### The Parties

Plaintiff Jenny Fan was appointed as the special administratrix

---

[1]The sublessee, Yong Shing, is not a party to this appeal. Defendants Auster Company and Auster Trust had filed third-party complaints against Yong Shing. However, on April 11, 2007, the circuit court entered an order dismissing their complaints with prejudice due to a good-faith settlement made by Yong Shing.

for the estate of Ru Hai Liu for the purpose of bringing this lawsuit. The deceased, Ru Hai Liu, was working on April 22, 2003, at 51 West South Water Street as an employee of the Yong Shing Wholesale Trading Company, when he fell down an elevator shaft and died. Liu, who was 45 years old at the time of the accident, was survived by a wife and daughter, age 42 and 19, respectively, who live in China. The deceased earned $450 per week and sent approximately $1,000 per month back to his wife in China.[2]

Defendant Auster Trust owned the building at 51 South Water Market Street in Chicago, where the accident occurred. Defendant Auster Trust leased this premises to defendant Auster Company, pursuant to a lease dated October 19, 1998. Defendant Auster Company was in the business of distributing produce to grocery stores, and it conducted its business on this premises from October 18, 1998, until shortly before December 1, 2002, when it moved to a new location at 2404 South Walcott Street. Thomas Bastounes testified that he is the president of defendant Auster Company and that he was on the premises on a daily basis, prior to December 2002.

In a lease dated November 15, 2002, defendant Auster Company subleased the premises to the Yong Shing Wholesale Trading Company. The sublease stated that the "term of lease" began on "12/1/02."[3] Yong Shing was in the business of providing produce and other supplies to Chinese restaurants in the midwest.

Bastounes, at his discovery deposition, described the premises as a "1920 vintage" building. The building, on Chicago's Near South Side, has since been converted to condominiums and townhouses, as reported by Bastounes.

When Bastounes decided to move his company and its workers out of the old warehouse, he still had the lease to pay.[4] Around the time

---

[2]In her interrogatory answer, plaintiff stated that decedent earned approximately $450 per week. The Illinois Industrial Commission's order, which settled the deceased's worker's compensation claim, stated that the deceased earned $450 per week. In a telephonic discovery deposition, Ming Zhen Yan, the deceased's wife, testified that, the day before his death, the deceased called her and said that he was earning $1,800 per month, which computes to $450 per week. She also testified that he sent her approximately $1,000 every month.

[3]The sublease also stated that the term ended on "8/31/02," which is puzzling. Thomas Bastounes, president of defendant Auster Company, raised the issue of this date during his discovery deposition.

[4]The primary lease did not end until October 31, 2003. It required Bastounes' company to pay $144,000 per year, with upward adjustments linked to

that the Auster Company decided to move, Yong Shing was created,[5] with Bastounes as an investor.

From the record before us, the timing of Yong Shing's creation and demise appears to coincide approximately with the beginning and end of its stay in the premises. According to Bastounes, Yong Shing moved out of the premises "soon after" the accident, and Yong Shing ceased to exist within six months of moving out.

Although the sublease gives the appearance of an arm's-length transaction between two different companies, it was actually entered by Bastounes and Lim, whom Bastounes both hired for and later fired from Yong Shing.[6] While the sublease contains a signature line with the words "Qin Fu Huang" printed beneath it and a purported signature of "Qin Fu Huang" above it, Bastounes testified that it was actually Lim who entered the sublease on behalf of Yong Shing; Bastounes, of course, signed on behalf of Auster Company.

Bastounes must have had a strong financial interest in Yong Shing, because according to his testimony, he stopped by several times a week, just to check on finances. Bastounes could not recall whether he invested in Yong Shing as an individual or as part of Auster Company; however, it appears that he was certainly involved with the company.

Bastounes hired Yong Shing's two principal employees, DeCaire and Lim. According to Bastounes, DeCaire was the Auster Company's bookkeeper, but she stayed on the premises even after Auster Company moved out. According to DeCaire, Bastounes offered her the job as bookkeeper for Yong Shing. Lim, who spoke both English and Chinese, was described as the "boss" of Yong Shing by the deceased's wife.[7] DeCaire and Lim were the only two Yong Shing employees who spoke English, according to Bastounes, DeCaire and Lim.

---

the Consumer Price Index.

[5]Lim testified that John Zhu, an Auster Company salesman who reported to Bastounes, first approached Lim about Yong Shing in November 2002. Lim testified that he (Lim) was supposed to be one of the people "who start up the company *** but something happened and [sic] I did not go according to plan." Lim never explained whose "plan" it was.

[6]Lim testified that he was hired by John Zhu, but that he understood that Zhu's boss was Bastounes, and Bastounes was present at the final interview. Lim testified that Bastounes was the person who later fired him from Yong Shing.

[7]In essence, Bastounes agreed that Lim was the boss of Yong Shing, when he testified that Lim's job was "to manage the business and operate the company and be the liaison between the Asian folks that were running the company and the investors."

Other than DeCaire and Lim, there were approximately six or seven Chinese men who worked in the warehouse, according to Lim. While we do not know for certain the legal status or residence of the other five or six men, we do know that the deceased was an illegal alien, who not only worked but also lived at the warehouse, according to his wife. DeCaire testified that she did the payroll. However, when she was asked whether the warehouse workers had social security numbers or worked 40 hours per week, or had home addresses, she repeatedly answered: "I don't recall." She also could not recall whether she prepared W-2s for them or whether they lived on the premises.

After the Auster Company moved out and the Chinese workers moved in, there is no evidence in the record of any major repairs made to the building or its elevators. After the deceased died, Bastounes testified that Yong Shing moved out, "soon after," and the warehouse was sold and converted to condominiums and townhouses. Bastounes testified that the building was "gutted," with only the walls left standing. Yong Shing went out of business within six months of the accident, according to Bastounes.

### Language of the Lease and Sublease

Paragraph 14 of the primary lease was entitled "Repairs and Maintenance," and it described the lessee and the lessor's respective obligations for both "non-structural" elements and "structural elements." It stated, in full, as follows:

"A. Lessee shall keep all non-structural portions of the Leased Premises and appurtenances thereto in a clean, sightly and healthy condition, and shall maintain all portions of the Leased Premises (except to the extent the Lessor is obligated to maintain the same, as provided in Section 14.B) in good repair, all according to the statutes and ordinances in such cases made and provided, and the directions of public officers thereunto duly authorized, all at its own expense, and shall yield the same back to Lessor upon the termination of this Lease, whether such termination shall occur by expiration of the term, or in any other manner whatsoever, in the same condition of cleanliness, repair and sightliness as at the date of the execution hereof, loss by insured casualty and reasonable wear and tear excepted. Lessee shall make all necessary non-structural repairs and renewals upon Leased Premises and shall replace broken globes, glass and fixtures with material of the same size and quality as that broken.

B. Lessor shall be solely responsible, at Lessor's sole cost and expense, to maintain the roof, foundation and structural elements of the building in which the Leased Premises is located. Notwith-

standing the foregoing, Lessee covenants, throughout the term of this Lease, to take good care of all portions of the Leased Premises' interior and exterior, structural and non-structural, including without limitation, all gas, electric and plumbing fixtures, systems or equipment, other equipment and/or fixtures located upon the Leased Premises, motors, machinery, roof, ceiling and parking lot, and shall promptly repair at Lessee's sole cost and expense, any damages to the Leased Premises or the building in which the Leased Premises is located, which is caused by Lessee or Lessee's agents, representatives or contractors. The term 'repairs' shall include replacements or renewals when necessary, and all such repairs made by Lessee shall be equal in quality and class to the original work and/or item being repaired. At the termination of this Lease, Lessee shall surrender the Leased Premises in the same condition as when received, reasonable wear and tear excepted."

The 2002 sublease to Yong Shing stated that the "Lessee shall keep the Premises and appurtenances in a clean, sightly, orderly and healthy condition and in good repair, and shall perform all acts required to maintain Premises in accordance with applicable statutes, ordinances and other governmental requirements." The sublease also allowed the lessor "free access to the Premises at all reasonable hours *** to make any repairs or alterations on the Premises which Lessor may deem fit to make." At the end of the sublease, just above the signatures and added by hand, were the following two sentences:

"The Lessee assumes all payment and performance terms of the lease attached hereto. In the event, there is an inconsistency between this and the attached, the attached shall control."

Although the lease and the sublease did not state whether the elevators, or specifically the elevator doors and gates, were considered structural or nonstructural, the deposition of Thomas Bastounes, president of defendant Auster Company, shed some light on that issue. Bastounes testified that between 1998 and 2002, when defendant Auster Company occupied the premises, John Cusimano performed "regular maintenance and repair" on the elevators, and that "for anything beyond his scope, we would go through an elevator company," named All-Types Elevators. Cusimano was an Auster Company employee who performed general maintenance throughout the building. At some point between 1998 and 2002, defendant Auster Company had all the elevator doors replaced. Bastounes paid the bill for the repair work on the elevators and did not forward the bill to defendant Auster Trust. Bastounes testified: "I considered that to be my responsibility." Bastounes described, as follows, what his company had replaced at its own expense:

"New doors, gates, hardware, sheaves, chains, posts, install electrical gate switches, pipe, wire, et cetera. I mean, it's detailed on their invoice. But essentially all new—each elevator has two doors, an inner door and an outer door, they were replaced. And all the electronic mechanisms to provide they were in good working order were also replaced."

## Conduct of Parties After Sublease

Mary DeCaire testified at her deposition that she worked for Yong Shing during the time of the accident, and for defendant Auster Company both before and after her employment with Yong Shing. She began working for defendant Auster Company in 2000, handling accounts receivable at the 51 South Water location. She had worked for defendant Auster Company for approximately three years, when her boss, Thomas Bastounes, asked her if she would like to work for Yong Shing. Starting at approximately the beginning of 2003, she worked at the same location, doing the same job, but now for Yong Shing, instead of defendant Auster Company. Later, after Yong Shing quit the premises, DeCaire returned to work for defendant Auster Company, for four or five months during 2004.

DeCaire testified that the office manager for Yong Shing was Patrick Lim, who had not previously been an Auster employee. Once she started working for Yong Shing, she still saw Thomas Bastounes three or four times a week. She testified that he came to the premises "just to make sure everything [was] running smoothly, taking care of any problems or hitches or anything that was happening with the company."

DeCaire testified that when there were maintenance issues, she was the person at Yong Shing to make a call. When there was a maintenance issue, she had to inform Bastounes about the problem and about what work would be done to fix it, and he had to sign off on the work before it was undertaken. DeCaire testified that Bastounes also had the authority to "sign off" on checks for Yong Shing. DeCaire was not aware of any written company policy by Yong Shing concerning elevator maintenance.

DeCaire testified that, during the approximately four-month period between Yong Shing's acquisition and the deceased's accident, she made calls to fix both the elevators and the forklift trucks. DeCaire did not recall specifically what the maintenance needs were for the elevators; she remembered only that they had generally not been working. When an elevator was not working, DeCaire testified that she "would call probably Mr. Bastounes and see if he could get someone to come and fix it." DeCaire recalled that there was a company that came to fix the elevators, but she did not recall ever

calling the company directly. She testified that the elevators broke down three or four times during the four-month period prior to the accident.

DeCaire testified that the deceased's accident involved the middle elevator, that she had notified Bastounes about the need for repairs to the middle elevator at some point during the four-month period prior to the accident, and that she did not know whether any repairs were made.

DeCaire also testified that John Zhu,[8] a salesman with defendant Auster Company, was also "on the [Yong Shing] premises a lot." DeCaire explained that Zhu spoke Chinese and "helped out with translation."

Thomas Bastounes testified at his deposition that prior to the move, defendant Auster Company had approximately 40 employees, who included Mary DeCaire and John Cusimano, but not Patrick Lim. Lim never worked for defendant Auster Company.

Bastounes admitted that, even after defendant Auster Company moved out, he still visited the premises "a few times a week to meet with Mary DeCaire." He claimed that they discussed only the "financial aspects" of Yong Shing's business. Bastounes testified that DeCaire, whom defendant Auster Company had employed as a "bookkeeper," remained on the premises after the move and became a Yong Shing employee. Bastounes did not "recall" if DeCaire had discussed elevator maintenance issues with him. He denied being involved with building maintenance or repairs at that time.

When asked what he would have done if he had been informed that the safety interlocks on the elevator doors were broken, Bastounes replied: "Well, if it's a safety issue, I would have made sure that they were repaired or fixed." Bastounes admitted that John Cusimano, who was a maintenance employee with defendant Auster Company, still did some repair work at the premises after the move. Bastounes testified that Cusimano repaired "electric jacks in the fork lift" and that Cusimano was there "one maybe two instances when he helped repair equipment."

In the interrogatory response signed by Bastounes, defendant Auster Company stated that "former Auster Company employee, John Cusimano[,] would perform general maintenance at the premises referenced herein which would have included various safety issues," and that he "may have performed general maintenance on the freight

---

[8]DeCaire testified that she did not know how to spell his last name, but guessed at "Z-U-E." Patrick Lim testified that he believed the spelling was "Z-H-U" and that is the spelling that we use here for consistency's sake.

elevators of the referenced premises" during the two years prior to the accident. When asked to "[s]tate whether or not you had in your employ a janitor, custodian, and/or maintenance company for the premises at 51 South Water Market on April 22, 2003," the day of the accident, defendant Auster Company answered: "Yes. John Cusimano."

John Cusimano testified at his discovery deposition that he left the employ of defendant Auster Company at the beginning of June 2003, or just over a month after the accident. From 1984 until June 2003, he worked for Auster Company performing maintenance at the premises. When he started in 1984, his boss was Clark Auster. Back in 1984, the maintenance work that Cusimano performed on the elevators was "[j]ust little minor stuff." For example, "[i]f one of the guys would hit the gate and pop it off the track, I would put it back on the track." At some point, Cusimano became a maintenance supervisor; and after that, he did not do any work on the elevators. When the elevators needed major repair work, the work was performed by either Reliance Elevator or All-Types Elevators. When there was an elevator problem, Cusimano would call a service number and a repair person would be sent out.

Cusimano testified that after defendant Auster Company moved to a new warehouse location, he moved with the company. However, even after Yong Shing became a tenant at the premises, Cusimano still went over there to perform some maintenance, such as on a forklift and on "powerjacks." Cusimano testified Bastounes was his boss, and that "Bastounes would call me and let me know if I could take a ride over there." Cusimano testified that, after the move, he made repairs at the premises "maybe four or five times, the most." After making a repair, Cusimano would report back to Bastounes "what was the problem [and] that I took care of it."

Ming T. Lim testified at his discovery deposition that he used the American name of Patrick. Lim started working for Yong Shing in approximately January or February 2003, just a couple of months before the accident, and was fired approximately 9 or 10 months after the accident. John Zhu first approached Lim in November 2002 about Yong Shing, when Lim was working as the manager at K&W Trading. Zhu was also the person who interviewed and hired Lim for the Yong Shing position, although Bastounes was also present during the final interview. Lim testified that Zhu was a salesman who worked for Thomas Bastounes and that Zhu was on the premises "[o]nce every two day at least." Lim testified that Bastounes was the person who later fired him (Lim).

DeCaire described Lim as the office manager of Yong Shing. Similarly, Ming Zhen Yan, the deceased's wife, described Lim as her husband's "boss" and the one who paid her husband (in cash). Yan testified that for the month in which her husband died, "Boss Lim" refused to pay the amount for a full month, that he paid only $900, and that she was "very upset with that." By contrast, Lim testified that he was merely "the purchaser" for Yong Shing, that he also handled "some minor administrative stuff" and "accounting too," and that after a couple of months, he had some check-writing authority. Lim denied knowing what the deceased was earning or the deceased's rate of pay. With respect to questions about payroll and payment, Lim stated emphatically: "I'm not the one who [sic] do that."

Lim testified that the person "who start up" Yong Shing was Qin Fu Huang. The Yong Shing office personnel included Lim, Huang and DeCaire. In addition, there were approximately 10 drivers, 1 warehouse foreman, and 5 or 6 warehouse workers, including the deceased.

Lim testified that one or two weeks after he started working for the company, the warehouse supervisor reported to Lim that an elevator was not working; and Lim, in turn, reported it to DeCaire, who then contacted John Cusimano. Lim would see Cusimano whenever something was broken. Lim testified that he (Lim) had some responsibility for maintenance, because he was the only person who could speak both Chinese and English, and thus he was the only person who could relay information about a repair problem from the warehouse personnel to DeCaire.

Lim testified that there were meetings at defendant Auster Company's new location attended by: Lim; DeCaire; Bastounes; Hong, Yong Shing's warehouse foreman; and Huang, the person "who started up" Yong Shing. These meetings occurred approximately every three weeks, unless there were problems; and DeCaire and Huang attended only "sometimes." The topics at the meeting included "company operation, financial operations kind of stuff" but not maintenance.

## The Accident

There were no witnesses to the accident; however, Mary DeCaire, Patrick Lim and and an emergency response worker testified at their depositions about what they heard and witnessed during the aftermath.

Mary DeCaire testified that the accident occurred in a three-story warehouse building. The basement was used primarily for storage; the first floor was the place from where shipments were both received and sent; and her office was on the second floor, which she reached by using the stairs. During the course of a day, workers would move boxes

from the first floor to the basement, and from the basement to the first floor. In preparation for a shipment, the workers would gather the boxes on the first floor, and then the shipment would be packed on to a truck.

DeCaire testified that, on April 22, 2003, one of the workers was excited and pointing downstairs, so she went down to the first floor, where she was able to observe the deceased lying on top of an elevator car. The deceased was not moving. As she peered down at the elevator car, which was then at the basement level, DeCaire did not recall a gate or guard being in place on the first floor to prevent her from falling into the elevator shaft. At that moment, she was standing four or five feet from the elevator shaft.

DeCaire testified that, after viewing the deceased, she returned to her office on the second floor and called 911. After calling 911, DeCaire called defendant Auster Company "right away" to inform Bastounes about the accident. John Zhu, a salesman with Auster Company, answered the telephone; and she informed him of the accident, before speaking with Bastounes. An ambulance arrived, followed later by the police. DeCaire testified that since she was the only person on the premises at the time who spoke English, she assumes that she must have spoken with the police.

Thomas Bastounes testified that he received a telephone call from Mary DeCaire on the day of the accident, to inform him of the accident and death. However, he claimed that the call occurred "much after the fact" and that "the police were already there and gone." He testified that his reaction was emotional because "[y]ou hear somebody just was killed *in the building I own.*" (Emphasis added.) He visited the premises later that day and viewed the center elevator where the accident occurred, but he could not recall what he observed.

Bastounes testified that Yong Shing moved out of the premises "soon after" the accident. He testified that the premises were "under contract and sold" and "[e]verybody had to get out," but he was "not sure which came first, the chicken or the egg." He testified that the premises were "now all condos and townhouses," and that Yong Shing went out of business six to eight months after the accident.

Ming T. Lim testified at his deposition that he worked approximately nine months for Yong Shing Trading, starting in January or February of 2003; that he was not on the premises when the accident occurred; and that someone called him on the telephone to inform him that an employee had fallen. Lim testified that when he arrived, the police were already on the scene, and a police officer said "he's not looking very good." Lim testified that he did not look down into the elevator shaft and thus he did not view the victim. Lim

explained: "the reason I did not look is Chinese are kind of like superstitious." Lim provided the following testimony about the accident:

> "I believe no one witness the whole accident because it's a five or six man crew you see. When Mr. Huang—their job—The duty of the job is try to load merchandise into truck you see, and every single one of them go separately.
>
> I did ask that day, but they say that no one witness anything, but they heard a scream; and one of the crew, I don't know his name, he go and check it out; and the only thing he saw was Mr. Ru Hai Liu on the elevator. He already fell."

Lim did recall that, after the accident, he saw boxes and bags of carrots stacked near the freight elevator. Lim testified that it would have been the normal practice to stack materials and boxes near the elevator "because they lay out the merchandise *** and the place is very small."

Lim recalled signing a statement on the day of the accident for the police, and also signing a statement sometime later for the Occupational Safety and Health Administration (OSHA). Lim testified that Yong Shing moved out of the premises a couple of weeks after the accident "because of accident *** because everybody is afraid."

Lim testified that he called the deceased's wife in China on two or three occasions to say that he would do his best "to take care of the body" and "to get compensation for her." She informed Lim that she wanted to come to the United States to take care of the body; and Lim relayed this information to Bastounes. Bastounes told Lim that "he's going to check and see what he can do."

Jill Gariti testified at her deposition that she was "on the fire department," that she was "doing the 911 runs," and that when she responded to a "sick run" in April 2003, she was "very surprised" to find "a man at the bottom of an elevator shaft."[9]

Gregorio Perez testified that he was a patrolman with the Chicago police department and that he was on foot patrol on April 22, 2003, when DeCaire flagged him down and stated that an employee had fallen down an elevator shaft. When Perez looked down the elevator shaft, he observed "a man laying [sic] down on his back at the bottom of the elevator shaft" and the man was not moving. Right in front of the elevator shaft, there were pallets of produce, including "lettuce stacked high" and "bags of carrots." After observing the body, Perez walked down to the basement. There were no gates or doors blocking

---

[9]Since only excerpts of Gariti's deposition were provided in the record on appeal, our description of her testimony is choppy.

Perez's entry to the elevator shaft. Perez observed a pool of blood near the man's head, and Perez believed that the man was dead. Acting as an interpreter, Patrick Lim informed Perez that another employee, named Quin, stated that the deceased "was standing on a bag of carrots reaching up for a case of lettuce, and he had heard a yell and a thump and that was it." Quin pointed in order to show Perez where the deceased had been standing. After the victim was removed from the premises, Perez went to Stroger Hospital, where the victim was pronounced dead.

On September 23, 2003, OSHA fined Yong Shing Trading Company $2,100, stating:

"On or about April 22, 2003, a wall opening (elevator shaft) for which there was a drop of (13) feet, were [sic] not guarded by a rail, roller picket fence, half-door, or equivalent. Employee(s) working in the vicinity were thereby exposed to falling into the elevator shaft."

On October 3, 2003, OSHA fined Yong Shing an additional $2,100, stating:

"On or about April 22, 2003, the freight elevator in the facility at 51 West South Water Market, Chicago, IL 60608 was not provided with doors so interlocked at each floor as to prevent their opening when the freight elevator is not located at that floor."

Yong Shing wrote a check, dated October 17, 2003, to OSHA for $4,200.

## Expert Testimony

In plaintiff's interrogatory answers, plaintiff stated that she had the accident premises inspected by David Lewandowski, of American Midwest Home and Building Inspection Service. Plaintiff provided defendants with photographs taken by Lewandowski on May 3, 2003, less than two weeks after the accident.

In addition, the parties deposed Richard Gregory, who testified as plaintiff's elevator expert. Gregory testified that he worked for over 40 years in the elevator field, starting when he was in high school. He was the vice-president and then president of Gregory Elevator, Inc., from 1964 to March 1981; chief engineer of the Gregory Division of Westinghouse, from 1981 to 1984; vice-president of technical support for Adams Elevator Equipment Company, a company that manufactured elevator parts, from 1982-97; and an elevator consultant, from 1984 to the present.

In a report dated June 8, 2007, Gregory concluded:

"1. The elevator historically was allowed by the owners/managers of the building, to violate the provisions of the Chicago Building Code relating to hoistway door interlocks as shown by the records of the Elevator Inspection Bureau, thus showing that the negligence of building ownership/management was longstanding.

\*\*\*

3. The elevator was unsafe on the date of the incident because the hoistway door interlocks were not functional, and the hoistway door at the 1st floor was open with the elevator at the 3rd floor.

\*\*\*

5. The records clearly show that the building owners/managers did not have regular routine maintenance of the elevator equipment by a qualified elevator contractor \*\*\* to perform monthly maintenance.

\*\*\*

7. Mary E. DeCaire told Thomas Bastounes that the elevator needed repair [citations] prior to the date of the incident that killed Liu. Had Thomas Bastounes arranged for proper repair of the elevator, Liu would not have been killed."

At his deposition, Gregory testified that any of the office employees, who climbed the stairway to the second-floor office, would have seen that the doors of the freight elevator were open. He stated: "The stairwell \*\*\* overlooks the elevator when you walk up to the second floor, so you can see the door is open. That is pretty obvious." When questioned about DeCaire's testimony that she did not recall noticing an open elevator shaft, Gregory opined:

"I think these interlocks were bypassed when the Auster Company was there and everybody just assumed that is the way it was supposed to be, and therefore they didn't even notice it."

DeCaire had been asked: "Did you ever walk by one of these elevators before Mr. Liu's accident and see an open elevator [shaft] but no elevator car sitting there." She responded: "I don't recall."

## Procedural History

Plaintiff brought this action on October 28, 2003. In her second amended complaint, filed on October 8, 2004, plaintiff named as defendants the Auster Company and the Auster Trust, as well as Thomas Bastounes. On March 1, 2006, the trial court granted plaintiff's motion to voluntarily dismiss Bastounes.

In the second amended complaint, plaintiff alleged two counts: count I, for wrongful death; and count II, a survival action. In its answer, defendant Auster Company alleged an affirmative defense of contributory negligence by the deceased.

On April 26, 2007, defendants moved for partial summary judgment on plaintiff's claim for lost income on the grounds: (1) that plaintiff failed to provide evidence of the deceased's income or immigration status; and (2) that the deceased was illegally present in the United States.

On June 13, 2007, defendants moved for summary judgment claiming that (1) they did not have "a duty to maintain the premises which were being leased and controlled by Yong Shing at the time of the accident," and (2) plaintiff cannot show that "any act, omission or conduct" of defendants "caused or contributed to" the decedent's accident.

On August 16, 2007, the trial court entered an order granting summary judgment in favor of defendants. However, the caption of the order listed the defendants as the Auster Company and the South Water Market, Inc. On August 20, 2007, the trial court vacated the August 16 order and again entered summary judgment in favor of defendants, but with a corrected caption.

On August 18, 2007, the trial court stated in open court its reasons for granting summary judgment:

"The court does not find evidence that there was control over the premises by the landlord in this case.

These are leased premises, and an employee of Auster Company was on the premises, but there is no evidence to suggest that he controlled what was going on in that business or on the premises or that he made any agreements to maintain the premises or repair the premises.

There was—there's evidence of repair of a forklift, and the forklift is not the premises, so there's simply no evidence in the record before me to show any kind of control by the landlord."

Plaintiff filed a notice of appeal on September 13, 2007, appealing "the order and judgement entered on August 20, 2007," and this appeal followed.

## ANALYSIS

On appeal, plaintiff claims that defendants were not entitled to judgment as a matter of law, and thus the trial court erred by granting summary judgment in favor of defendants.

Specifically, plaintiff claims that the sublease did not release defendants from their responsibility of maintaining the elevator, because the primary lease made defendants responsible for maintaining the premises; and the sublease provided that if there was an "inconsistency" between the lease and the sublease, then the lease "shall control." In the alternative, plaintiff claims that, even if the sublease did release defendants from their obligation to maintain the premises, defendants voluntarily assumed maintenance of the elevator, thereby rendering them liable for Liu's death.

### Standard of Review

"Summary judgment is a drastic method of disposing of litigation." *Ramirez v. Smart Corp.*, 371 Ill. App. 3d 797, 801 (2007). A trial

court may grant a motion for summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 2006). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). "Summary judgment should only be allowed when the right of the moving party is free from doubt." *Illinois Farmers Insurance Co. v. Hall*, 363 Ill. App. 3d 989, 993 (2006).

On appeal, our standard of review is *de novo*; and we may affirm the trial court's grant of summary judgment on any ground apparent from the record. *Home Insurance*, 213 Ill. 2d at 315; *Ramirez*, 371 Ill. App. 3d at 801 (review is *de novo*).

## Lease Language

■ Plaintiff acknowledges that the general rule is that only the persons currently in possession and control of a property are liable for its negligent maintenance. *Guerino v. Depot Place Partnership*, 273 Ill. App. 3d 27, 31 (1995). Generally, the lessee who is in possession, not the lessor, is liable for injuries sustained by third parties and caused by a failure to keep the property in good repair. *Guerino*, 273 Ill. App. 3d at 31. See also *Gilley v. Kiddel*, 372 Ill. App. 3d 271, 275 (2007); *Jackson v. Shell Oil Co.*, 272 Ill. App. 3d 542, 548 (1995). "The basic rationale for this doctrine of lessor immunity is that a lease is a conveyance of property which ends the lessor's control over the premises, a prerequisite of tort liability." *Guerino*, 273 Ill. App. 3d at 30-31; *Gilley*, 372 Ill. App. 3d at 275; *Jackson*, 272 Ill. App. 3d at 548.

However, this general rule has a number of exceptions. *Gilley*, 372 Ill. App. 3d at 275; *Wright v. Mr. Quick, Inc.*, 109 Ill. 2d 236, 239 (1985). Thus, for example, a lessor may be liable (1) where the lessor has expressly agreed to keep the premises or parts of it in good repair; or (2) where the lessor has voluntarily assumed the maintenance obligation by its conduct. *O'Rourke v. Oehler*, 187 Ill. App. 3d 572, 580 (1989); *Kuhn v. General Parking Corp.*, 98 Ill. App. 3d 570, 574 (1981). In the case at bar, plaintiff claims that both exceptions apply.

Plaintiff claims that the first exception, the express agreement, can be found in the words of the two leases. The words in a contract are given their plain, ordinary meaning. *SBC Holdings, Inc. v. Travelers Casualty & Surety Co.*, 374 Ill. App. 3d 1, 10 (2007); *Allstate Insurance Co. v. Smiley*, 276 Ill. App. 3d 971, 977 (1995). When construing the words in a contract, a court will try to ascertain and give effect to the intent of the parties. *Rich v. Principal Life Insurance Co.*, 226 Ill.

2d 359, 371 (2007); *Eichengreen v. Rollins, Inc.*, 325 Ill. App. 3d 517, 521 (2001). A contract is "construed as a whole, giving effect to every provision." *Rich*, 226 Ill. 2d at 371.

■ In the case at bar, the words of the primary lease made defendant Auster Trust "solely responsible" for maintaining the "structural elements" of the premises, and defendant Auster Company responsible for keeping nonstructural elements "in good repair." Plaintiff claims that the sublease did not release defendants' from their obligations under the primary lease, due to a handwritten addition to the sublease that stated "[i]n the event, there is an inconsistency between this and the attached, the attached shall control."

The problem with plaintiff's interpretation is twofold. First, plaintiff's interpretation of the second handwritten sentence renders meaningless the first handwritten sentence. *Rich*, 226 Ill. 2d at 371 (a contract is "construed as a whole giving effect to every provision"). The first handwritten sentence stated: "The Lessee assumes all payment and performance terms of the lease attached hereto." "The Lessee" in that sentence is Yong Shing, the sublesee. By this sentence, the sublesee, Yong Shing, accepted all the payment and performance terms, previously undertaken by the lessee, Auster Company, pursuant to the "attached" lease. Thus, to the extent that Auster Company was previously responsible for keeping nonstructural elements in good repair, this first sentence now passed that responsibility to Yong Shing.

Plaintiff wants us to interpret the second sentence in a way that removes all meaning from the first sentence. The second sentence states that if "there is an an inconsistency between this and the attached, the attached shall control." Plaintiff claims that since the "attached" primary lease places performance responsibilities on Auster Company, and the sublease is inconsistent with this, then the second sentence means that the performance responsibilities remain with defendant Auster Company. Plaintiff's interpretation of these two sentences would have the first sentence taking away performance responsibilities from Auster Company, and then have the second sentence returning them to defendant Auster Company. This is not logical. "A court will consider only reasonable interpretations ***." *Rich*, 226 Ill. 2d at 372.

It is more reasonable to interpret the second sentence in conjunction with the first sentence and to read the second sentence as stating: "In the event, there is an inconsistency [in payment and performance terms] between this [sublease] and the attached [primary lease], the attached [primary lease] shall control." See *Wright v. Mr. Quick, Inc.*, 109 Ill. 2d 236, 241-42 (1985) (although the sublease stated that it was "subject to the terms and conditions" of the primary lease, that did

not mean that the parties intended to continue the sublessor's repair obligations under the primary lease).

Second, taken to its extreme, plaintiff's interpretation nullifies the entire sublease. *Jewelers Mutual Insurance Co. v. Firstar Bank Illinois*, 213 Ill. 2d 58, 65 (2004) ("[a] party cannot promise to act in a certain manner in one portion of a contract" and then nullify "that very promise in another part of the contract"). Plaintiff's interpretation places too much meaning into the word "this." Plaintiff claims that the word "this" in the quoted sentence refers to the entire sublease, and that if there is any inconsistency between "this" entire sublease and the entire primary lease, then the primary lease controls.

The problem is that practically everything in the sublease could be interpreted as being "inconsistent" with the primary lease. The sublease makes Yong Shing responsible for paying the rent "per attached" lease, while the primary lease made defendant Auster Company responsible. The sublease makes Yong Shing responsible for keeping the premises in good repair, while the primary lease made defendant Auster Company responsible. However, if we interpret the words "this" and "the attached" as referring to the "payment and performance terms" in the prior sentence, then the sublease does not become a nullity.

Thus, we interpret these two sentences as passing to Yong Shing the obligation to maintain the nonstructural elements in good repair. However, this still leaves defendant Auster Trust "solely responsible" for the maintenance of the "structural elements of the building." By becoming a sublessee, Yong Shing assumed the maintenance obligations of the lessee—not those of the lessor, defendant Auster Trust.

That brings us to the question of whether the deceased's fall was proximately caused by a failure to maintain a structural element or a nonstructural element. This question is key to this appeal, because the lease made Auster Trust solely responsible for maintaining the former, while the sublease made Yong Shing, which is not a party to this appeal, responsible for maintaining the latter.

None of the parties briefed this issue on appeal, although at oral argument, plaintiff's counsel stated that the elevator was structural and defense counsel stated it was nonstructural. Defendants Auster Trust and Auster Company are represented on this appeal by the same law firm. Thus the trust did not argue that the company was potentially more liable because the cause was nonstructural, and the company did not argue that the trust was potentially more liable because the cause was structural. Defendants refrained from pointing the finger at each other.

Plaintiff did not brief this issue either, stating in her appellate brief that "the nature of the elevator defect is not at issue." Plaintiff's appellate brief asserted: "At this point in the litigation, it is not material which of the defendant corporations had the obligation to maintain this particular building element. The only material point is that at least one of them had that obligation \*\*\*."

Despite plaintiff's assertion, the point is material. Even after the sublease, defendant Auster Trust was still "solely responsible" for the maintenance of the structural elements. By the sublease, sublessee Yong Shing assumed the performance duties of lessee Auster Company, not the duties of the building's owner, lessor Auster Trust. Thus, if the cause was structural, then defendant Auster Trust may be liable, and the grant of summary judgment as to that defendant was in error.

Since the record before us leaves a genuine issue as to whether the cause was or was not structural, this genuine issue of material fact prevents the entry of summary judgment in favor of defendant Auster Trust. *Bourgonje v. Machev*, 362 Ill. App. 3d 984, 995 (2005) (" 'the issue of proximate cause is ordinarily a question of fact determined by the trier of fact' "), quoting *Abrams v. City of Chicago*, 211 Ill. 2d 251, 257-58 (2004).

The words of the lease and sublease still leave open the possibility of summary judgment for defendant Auster Company. As already noted, if the cause was structural, then defendant Auster Trust may be liable. On the other hand, if the cause was nonstructural, then the sublease made Yong Shing potentially liable. In either case, whether the cause was structural or not structural, the words of the lease and sublease released defendant Auster Company from a maintenance obligation. However, defendant Auster Company may still be liable if it voluntarily assumed this obligation by its conduct.

Thus, defendant Auster Company is entitled to summary judgment only if the record leaves no genuine issue of material fact about whether it voluntarily assumed the obligation to maintain the elevator. *Guerino*, 273 Ill. App. 3d at 31 (lessor's "use and maintenance of the premises created a question of fact to be resolved by the trier of fact as to whether it controlled and possessed the premises"); *O'Rourke*, 187 Ill. App. 3d at 581 (since lessor voluntarily assumed a maintenance obligation, there was "a question of material fact" as to whether lessor "knew or should have known of the condition"); *Bourgonje*, 362 Ill. App. 3d at 1011-12 ("a jury must be allowed to determine" whether landlord voluntarily promised to light premises to protect tenant from criminal attacks).

## Conduct

Plaintiff claims that defendants voluntarily assumed the maintenance obligation by their conduct. It is well established that a third party may recover damages from a lessor—despite a lease of the premises to the lessee—if the lessor voluntarily assumed a maintenance obligation by its conduct. *Klitzka v. Hellios*, 348 Ill. App. 3d 594, 598 (2004); *Guerino*, 273 Ill. App. 3d at 31 (lessor may be liable to employee of lessee, due to lessor's continued use and maintenance of premises); *O'Rourke*, 187 Ill. App. 3d at 581 (lessor may be liable for a death by electrocution, where lessor gave her permission during the tenancy for replacement of wires); *Kuhn*, 98 Ill. App. 3d at 575 (lessor was liable to lessee's employee, who tripped over broken floor tile, since it was "standard procedure" for lessor to repair floor tiles). See also *Bourgonje*, 362 Ill. App. 3d at 995, 1011-12 (landlord may be liable if jury finds that landlord voluntarily promised to light premises to protect tenant from criminal attacks); *Jackson*, 272 Ill. App. 3d at 549 ("liability may be imposed on a landlord who voluntarily undertakes to provide security measures, but performs the undertaking negligently").

A lessor voluntarily assumes a maintenance obligation when it continues to maintain and to retain control over the aspects of the premises at issue. *Guerino*, 273 Ill. App. 3d at 31 (lessor may be liable due to its continued maintenance and control of the premises); *O'Rourke*, 187 Ill. App. 3d at 580 (lessor may be liable where it "ha[d] regularly performed a certain type of maintenance work on the premises"); *Kuhn*, 98 Ill. App. 3d at 575 (lessor was liable where it "maintained control" over the aspect of the premises at issue).

The affairs of Yong Shing and defendant Auster Company were so intertwined that it is impossible for us to say on the record before us whether it was defendant Auster Company or Yong Shing that maintained control over the elevators. The two companies were intertwined through the persons of Thomas Bastounes, who had a dual role as both president of defendant Auster Company and as an investor in Yong Shing; and Mary DeCaire, who was the bookkeeper at the premises, no matter which company she was technically working for.

The record before us establishes the following facts; and these facts create a genuine issue about whether defendant Auster Company kept control over the premises and specifically over elevator maintenance:

> 1. Thomas Bastounes, president of defendant Auster Company, was also an investor in Yong Shing, either individually or as defendant Auster Company; he could not recall which.

2. Bastounes could sign for both companies: he signed the sublease for Auster Company; but he could also "sign off" on Yong Shing's checks.

3. Although the sublease between Auster Company and Yong Shing contains a signature line for Qin Fu Huang to sign as president of Yong Shing, Bastounes testified that "Patrick Lim entered [the contract] for him [Huang]"; and, as noted below, Lim was hired (and later fired) by Bastounes from his Yong Shing position.

4. Patrick Lim, whom others described as the manager or "boss" of Yong Shing, testified that he was approached, interviewed and hired for the Yong Shing job by John Zhu, a salesman with defendant Auster Company; that his final interview included a meeting with Bastounes; and that Bastounes was the person who later fired him from his Yong Shing position.

5. Even after defendant Auster Company moved out and Yong Shing moved in, Bastounes visited the premises several times per week.

6. In the interrogatory response signed by Bastounes, defendant Auster Company admitted that John Cusimano, who was an Auster Company employee, performed general maintenance at the premises, which included "safety issues" and "may" have included the elevators, and that Cusimano was still performing maintenance at the premises on April 22, 2003, the day of the accident.

7. DeCaire, who made the maintenance calls for Yong Shing, was offered her job at Yong Shing by Bastounes; and she worked for defendant Auster Company, both before and after her employment with Yong Shing, performing essentially the same job.

8. DeCaire testified that Zhu, although an Auster Company salesman, was "on the [Yong Shing] premises a lot," and "helped out with translation"; Lim testified that Zhu was present "[o]nce every two days at least."

9. Lim testified that meetings were held approximately every three weeks at defendant Auster Company's new location and were attended by: Lim; DeCaire; Bastounes; Hong, Yong Shing's warehouse foreman; and Huang, the person who "started up" Yong Shing.

10. DeCaire testified that, during her stint at Yong Shing, she still had to inform Bastounes about any maintenance problems and obtain his approval before undertaking any work.

11. Lim testified that one or two weeks after he started working for the company in January or February 2003, the warehouse supervisor reported to Lim that an elevator was not working; and Lim, in turn, reported it to DeCaire, who then contacted John Cusimano, defendant Auster Company's maintenance man.

12. DeCaire testified that she notified Bastounes, at some point during the four-month period prior to the accident, about the need for repairs to the middle elevator, where the decedent was killed.

13. Bastounes testified that if he had been informed that the safety interlocks on the elevator doors were broken, he "would have made sure that they were repaired or fixed."

14. DeCaire testified that she called Bastounes, right after calling 911; and Bastounes testified that he was upset when he heard that someone had been killed "in the building I own."

15. Lim testified that, after the deceased's wife told him that she wanted to come to the United States to take care of the body, the person whom Lim informed was Bastounes, and Bastounes said that he would "see what he could do."

With respect to the last two facts, while evidence of subsequent remedial action is "inadmissible to show prior negligence, it is admissible to show who controlled the premises when control is in issue." *Kuhn*, 98 Ill. App. 3d at 575.

These facts establish that Bastounes, and people working for him or at his direction and control, exercised a great deal of control over the activities taking place on the Yong Shing premises. These facts certainly create a genuine issue about whether his company, defendant Auster Company, retained control over elevator maintenance, even after the sublease to Yong Shing. This issue precluded a grant of summary judgment for defendant Auster Company.

## CONCLUSION

For the foregoing reasons, we reverse the order of the trial court which granted summary judgment in favor of defendants and remand for proceedings consistent with this opinion. First, since the record before us leaves a genuine issue as to whether the proximate cause of decedent's accident was or was not "structural" as provided by the lease, this genuine issue of material fact prevents the entry of summary judgment in favor of defendant Auster Trust. Second, the record also leaves a genuine issue of material fact as to whether defendant Auster Company retained control over elevator maintenance, even after subleasing the premises to Yong Shing Trading Company.

Reversed and remanded.

HALL, J., concurs.

JUSTICE WOLFSON, specially concurring in part and dissenting in part:

Paragraph 14B of the lease between Auster Trust and Auster Company provides that the "Lessor [Auster Trust] shall be solely

responsible, at Lessor's sole cost and expense, to maintain the roof, foundation and structural elements of the building in which the Leased Premises is located." The trust cannot be liable for the injury that occurred here if the elevator was not a "structural element" within the meaning of the lease.

I do not see a fact issue concerning the elevator in the case against the Trust. Neither side presented or proposed any facts that would help in construing the language of the lease. There is no factual setting. It is simply a matter of contract construction for the trial court to decide.

It is said that when interpreting contracts " 'a word is known by the company it keeps.' " *Z.R.L. Corp. v. Great Central Insurance Co.*, 156 Ill. App. 3d 856, 859 (1987), quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 6 L. Ed. 2d 859, 863, 81 S. Ct. 1579, 1582 (1961). Put more formally, long-standing Illinois law holds it to be a general rule in construing contracts "that where an enumeration of specific things is followed by general words or phrases, the latter are held to refer to things of the same kind as those specified." *Webber v. City of Chicago*, 148 Ill. 313, 318 (1894). See also 17A C.J.S. *Contracts* §321 (1999) ("The meaning of words in a contract may be indicated or controlled by those words with which they are associated").

Here, the words "structural elements" are associated with, and are in the company of, "roof" and "foundation." I do not see how an elevator can be included within the "structural elements" of the building. It just does not fit. There is nothing ambiguous about paragraph 14B. For that reason, I respectfully dissent from the decision to reverse the grant of summary judgment to the Trust.

At the same time, the majority's excellent analysis of this unusual scenario persuades me there is a factual issue concerning the claim that, despite the sublease, the company controlled and possessed the premises at the time of the accident. See *Guerino v. Depot Place Partnership*, 273 Ill. App. 3d 27, 31 (1995). I concur in the majority's reversal and remand of summary judgment entered on behalf of the Auster Company.